**Fred B. BLACK, Jr., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 440–67.**

United States District Court, District of Columbia.

Jan. 10, 1975.

See also, D.C., 371 F.;Supp. 97.

530

Gerald S. Rourke, Washington, D. C., for plaintiff.

Neil R. Peterson, John J. Farley, III, Washington, D. C., for defendant.

### MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This matter is before the Court for decision on the issue of damages after trial of the facts concerning damages. This Court previously found the United States liable in tort to the Plaintiff Black by granting partial summary judgment for Plaintiff on theories of trespass, invasion of privacy by intrusion, invasion of privacy by publication, and violation of Constitutional rights. These intentional torts arose out of the Federal Bureau of Investigation's admittedly illegal electronic surveillance of Plaintiff's suite in the Sheraton Carlton Hotel in Washington, D.C., between February 7 and April 25, 1963.

The following constitute the Court's findings of fact and conclusions of law.

■ The Court concludes that this action is principally an action to recover for Plaintiff's losses caused by the intentional and admittedly illegal intrusion upon the Plaintiff's privacy and the publication of information derived from that illegal intrusion. As such this action is not barred by sovereign immunity since the United States has consented to suit through the Federal Torts Claims Act, 28 U.S.C. § 2671 et seq. The intentional torts complained of herein are not among the exceptions in 28 U.S.C. § 2680(h). Thus, 28 U.S.C. § 1346(b) confers jurisdiction on this Court to hear this complaint.

*The FBI's Electronic Eavesdropping and Dissemination of Information Constitute a Tortious Intrusion and Publication Which Violated Plaintiff's Right to Privacy*

■ In two memoranda submitted to the United States Supreme Court in May and July 1966, in Black's tax case, the Solicitor General of the United States revealed that the FBI had illegally eavesdropped upon Black. It was there revealed that on the afternoon of February 7, 1963, agents of the Federal Bureau of Investigation installed a tubular microphone through the common wall of a room adjoining the suite occupied by Black at the Sheraton Carlton Hotel in Washington, D.C. The microphone extended through the six inch common wall and one-fourth of an inch into the one-half inch molding of Black's suite. FBI agents began to eavesdrop on conversations in Black's suite on the afternoon of the following day and continued the eavesdropping until April 25, 1963.

No recording of any portion of the monitored conversations exists. The assignment of the monitoring agents was to keep a contemporaneous log in which were summarized the conversations in petitioner's suite. A tape recorder was available and was used to record particular conversations whenever a monitoring agent felt that such a recording would be helpful in preparing his summaries. After the summaries were prepared, the tapes were erased. While none of the recordings are, consequently, available today, the handwritten notes of the monitoring agents do exist. These notes summarize the conversations and, in some instances, contain excerpts from conversations.

The information concerning petitioner obtained by the monitoring agents was submitted to their superiors in the Federal Bureau of Investigation in the form of the handwritten notes or logs. The eavesdrop information was then included in airtels, internal FBI documents disseminated by the Washington Field Office to FBI headquarters and to various other field offices.

Some of the eavesdrop information was then incorporated into two FBI reports and two memoranda. The reports, dated April 17, 1963 and July 12, 1963, were then transmitted by the Federal Bureau of Investigation to the Criminal Division of the Department of Justice, and the memoranda, dated April 5, 1963

and April 9, 1963, were sent to the Attorney General with copies to the Criminal Division. The date on which the April 1963 report was received by attorneys in the Organized Crime and Racketeering Section is not known, but it was transmitted to the Office of the Assistant Attorney General in charge of the Criminal Division, where it was received on November 6, 1963. The July 1963 report was received in the Organized Crime and Racketeering Section on August 2, 1963, and in the Office of the Assistant Attorney General in charge of the Criminal Division on October 28, 1963. The memoranda were received in the Office of the Attorney General on April 5 and April 9, 1963, respectively. The reports did not disclose that the information contained in them had been obtained by electronic eavesdropping.

At the time one of the functions of the Organized Crime and Racketeering Section of the Department of Justice was to analyze, correlate, index and file information contained in the various intelligence reports submitted to it, and to disseminate the information which it had received and broken down to the 26 federal agencies involved in the Government's drive against organized crime. This procedure was followed with respect to the FBI reports concerning Mr. Black.

In his memorandum to the Supreme Court the Solicitor General stated that the FBI reports of April 17, 1963, and July 12, 1963, were "captioned anti-racketeering since these dealt with [Black's] *possible* affiliation with organized crime activity in the United States." (Emphasis added.) However, in a footnote to this statement the Solicitor General stated that, "Recital of these facts is not intended to suggest that any wrongdoing on the part of [Black] was uncovered by the monitoring."

*The Government's Refusal to Comply with Discovery Orders Resulted in This Court's Imposition of Sanctions Under Rule 37(b)(2)(A)*

■ The procedural steps leading to this Court's imposition of Rule 37 sanctions were as follows:

"On July 10, 1973, this Court ordered the United States to allow the Plaintiff to inspect and copy: (1) all documents containing leads obtained from the eavesdropping, including the FBI reports of April 17, 1963 and July 12, 1963; (2) all communications in response to the eavesdropping material, including any airtels the Washington, D.C. office of the FBI received in response to the airtels it sent out requesting information concerning the Plaintiff; and (3) all documents relating to the leaving in place of the microphone after April 25, 1963 and any subsequent activation of the microphone. As of this date the United States has refused to comply with this order. It has refused to do so based on its claim of executive privilege which was made in an affidavit by the then Attorney General Elliot Richardson and filed October 19, 1973. The affidavit claims executive privilege as to the remainder of the file—that which had not previously been disclosed.

"The Court has granted the Plaintiff's Motion for Partial Summary Judgment on the issue of liability, since the United States has admitted that it conducted the surveillance and disseminated the information obtained as a result of the surveillance. The sole issue remaining is the question of damages. The Plaintiff maintains that the documents he seeks are necessary to substantiate his claim for damages caused by the dissemination of the sureveillance information and its fruits. Earlier, the Court felt the information the Plaintiff needed could be obtained without disclosure of the documents. The Court, therefore, found that the Plaintiff's need did not outweigh possible public interest in maintaining the confidentiality of the files. However, the suggested alternative—deposing the FBI agents involved in the surveillance regarding

dissemination of the information—has proved to be an inadequate method of obtaining the necessary evidence."

371 F.Supp. 97, 99 (D.D.C. January 21, 1974).

On January 21, 1974, the Court found that the claim of executive privilege was improperly asserted in Black v. Sheraton Corp., 371 F.Supp. 97 (D.D.C.1974). The Court issued its July 10, 1973 order for discovery before the government entered the Attorney General's affidavit which allegedly supported the government's claim of executive privilege. Upon consideration of this affidavit the Court explained the insufficiency of the belated claim in the January 21, 1974, opinion.

The continued refusal by the government to comply with the discovery order forced the Court to impose sanctions in accordance with Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure. These sanctions established for the purpose of the case the truth of the following allegations in the complaint:

"(1) that the FBI reports or the information contained therein caused the Plaintiff to lose his employment as a Washington representative for major national corporations; (2) that the FBI reports or the information contained therein have destroyed the Plaintiff's livelihood and permanently impaired his ability to obtain employment; (3) that the FBI reports or the information contained therein have greatly damaged the Plaintiff's name and reputation and have caused him the loss of friends and business associates; and (4) that the FBI reports or the information contained therein have caused the Plaintiff great mental pain and suffering, embarrassment and humiliation."

*Effect of the Rule 37 Sanctions on the Damages Issue at Trial*

▆ Partial summary judgment and the Rule 37 sanctions foreclosed the issue of liability and left for trial only the determination of damages. The Court was faced with the difficult task of framing the issue for trial in light of the fact that the government-withheld documents were clearly necessary for Plaintiff's proof of the causal connection between the unlawful intrusion and publication, on the one hand, and the alleged extensive damage to Plaintiff's business and livelihood. Moreover, the government claimed that there were other independent causes of Plaintiff's business and personal losses.

The Court issued an order on October 7, 1974, which denied Plaintiff's motion for a partial summary judgment on the amount of his business claims and which framed the trial issues, providing, *inter alia*, the following:

"The Defendant will be liable to Black for damages which were proximately caused by the government's tortious conduct. This is the ultimate issue for trial. The effect of the Court's sanctions is that it will be deemed established for trial that Plaintiff has made a *prima facie* showing of causation in fact; that is, that the government's conduct was a material element and a substantial factor in bringing about the business and personal losses to Black.

But if, as the government contends, there were other independent causes of Black's losses and if there is a logical and reasonable basis for apportioning Black's loss to each cause, a division or apportionment will be made. But if no such reasonable basis can be shown by the government, then the United States will bear the entire loss notwithstanding the fact that other causes may have contributed to the losses. The government will bear the burden for showing this reasonable basis for apportionment. *See* PROSSER, TORTS § 52 (4th Ed.).

The ultimate factual issue of what damages have been proximately caused is a concept incapable of a universal

534

formula. Considerations will include, but will not be limited to, (1) causation in fact, (2) apportionment of damages, (3) foreseeability of results, and (4) intervening causes. Consideration of these and other factors will be made by the Court in light of the conclusion that the United States is liable for intentional torts. *See, generally*, PROSSER, TORTS, ch. 7–8 (4th Ed.)."

Principles of due process require a court to impose Rule 37 sanctions if the defendant refuses to produce documents which are essential for the Plaintiff to prove his allegations or for the Plaintiff to negate the defendant's defense. The sanctions are not imposed as a deterrent or punishment alone, although they obviously have such an effect. Rather, the sanctions relieve the Plaintiff of a burden he should not have to bear without the documents. Therefore, the Court must carefully fashion the effect of the sanctions not only on the Plaintiff's allegations, but also on the Defendant's defense. "[T]he preservation of due process [is] secured by the presumption that the refusal to produce evidence material to the administration of due process [is] but an admission of the want of merit in the [government's] asserted defense." Hammond Packing Co., v. Arkansas, 212 U.S. 322, 351, 29 S.Ct. 370, 380, 53 L.Ed. 530 (1909).

The interests of due process dictate that the burden to apportion damages or to show that other causes were "intervening causes" be placed on the government under the unusual circumstances of this case. First, the effect of the sanctions requires that the government at least have the burden of going forward with the evidence at trial on the issue of proximate cause; otherwise, the sanctions would have no effect at all. Secondly, the government denied Plaintiff access to the FBI documents which, by themselves, may have provided evidence of proximate cause or else may have lead to such proof. Under those circumstances, it was unduly unfair to place upon Plaintiff the burden of negating each of the other allegedly independent causes which the government asserts to have intervened and to have caused Black's business and personal damages.

*Damages for Loss of Employment, Loss of Livelihood, and Loss of Ability to Obtain Employment*

The FBI reports or the information contained therein caused the Plaintiff to lose his employment as a Washington representative for major national corporations. The FBI reports or the information contained therein have destroyed Plaintiff's livelihood and permanently impaired his ability to obtain employment.

A reasonable basis for determining business/livelihood losses from the date of the tort to trial date is Black's income for the five years prior to the tort. These figures have been established in prior litigation between Black and IRS.

For the five years prior to the start of the eavesdropping in February 1963, Black's gross and taxable income from his employment as a Washington representative was as follows:

| Year | Gross Income | Taxable Income |
| --- | --- | --- |
| 1958 | $300,919.25 | $191,432.17 |
| 1959 | 286,818.08 | 195,240.77 |
| 1960 | 349,503.26 | 249,693.69 |
| 1961 | 433,527.92 | 202,879.84 |
| 1962 | 542,779.60 | 244,341.42 |

Black's average taxable income for these five years was $216,717.00.

Black's taxable income may be used as a net income figure for purposes of computing his lost earnings. This is a conservative figure to use for net income since under it Black's gross income is reduced by his personal deductions and exemptions as well as his business expenses.

Had Black's net or taxable income been $216,717.00 per year for each of the years from 1963 to the present, the

federal income tax rate applicable to that income would have been as follows:

| Year | Tax Rate | |
|---|---|---|
| 1963 | $134,640 | + 89% of excess over $200,000 |
| 1964 | $118,680 | + 76.5% of excess over $200,000 |
| 1965 | $110,980 | + 70% of excess over $200,000 |
| 1966 | $110,980 | + 70% of excess over $200,000 |
| 1967 | $110,980 | + 70% of excess over $200,000 |
| 1968 | $110,980 | + 70% of excess over $200,000 |
| 1969 | $110,980 | + 70% of excess over $200,000 |
| 1970 | 50% | |
| 1971 | 50% | |
| 1972 | 50% | |
| 1973 | 50% | |
| 1974 | 50% | |

For the year 1968 there was a surtax of 7.5%
For the year 1969 there was a surtax of 10%
For the year 1970 there was a surtax of 2.5%

Applying these tax rates, Black's tax and after-tax income on a net income of $216,717 per year for each of the years from 1963 to the present[1] would have been as follows:

| Year | Projected Net Income | Projected Tax | Projected After-Tax Income |
|---|---|---|---|
| 1963 | $216,717 | $148,880 | $ 67,837 |
| 1964 | 216,717 | 131,469 | 85,248 |
| 1965 | 216,717 | 122,682 | 94,035 |
| 1966 | 216,717 | 122,682 | 94,035 |
| 1967 | 216,717 | 122,682 | 94,035 |
| 1968 | 216,717 | 131,883 | 84,834 |
| 1969 | 216,717 | 134,950 | 81,767 |
| 1970 | 216,717 | 111,067 | 105,650 |
| 1971 | 216,717 | 108,359 | 108,358 |
| 1972 | 216,717 | 108,359 | 108,358 |
| 1973 | 216,717 | 108,359 | 108,358 |

Black's *actual* net income, tax, and after-tax income for the years 1963, 1964 and 1965, which were the subject of the prior tax litigation between the parties, were as follows:

| Year | Net Income | Actual Tax | Actual After-Tax Income |
|---|---|---|---|
| 1963 | $109,628 | $60,798 | $48,830 |
| 1964 | 66,362 | 26,288 | 40,074 |
| 1965 | 4,522 | 1,064 | 3,458 |

Black's actual net income, tax, and after-tax income, as shown on his tax return for the years 1966 and 1967, was as follows:

| Year | Net Income | Actual Tax | Actual After Tax Income |
|---|---|---|---|
| 1966 | $ 2,538 | 0 | $ 2,538 |
| 1967 | 48,281 | $21,559 | 26,722 |

There is no evidence in the record that Black had any income other than what was shown on his tax returns durings the years 1966 and 1967 from employment as a Washington representative or from any other source.

Black's only income during 1967 was $90,000 received in settlement of a lawsuit he had brought against North American Aviation. That settlement is taken into account hereby considering it as income to Mr. Black for that year and, accordingly, deducting it in the computation of the amount due Black as damages in this case. In that regard it is also noted that Black did not receive any of the proceeds of the North American settlement; the entire amount was divided between the Internal Revenue Service and his attorneys in that litigation.

Black's actual net income, tax, and after-tax income for the year 1968, as claimed by the Internal Revenue Service in litigation pending before the Tax Court, were as follows:

| Year | Actual Net Income | Actual Tax | Actual After-Tax Income |
|---|---|---|---|
| 1968 | $90,676 | $53,235 | $37,441 |

Black's actual net income, tax, and after-tax income, as shown on his tax return for the year 1969, were as follows:

| Year | Actual Net Income | Actual Tax | Actual After-Tax Income |
|---|---|---|---|
| 1969 | $66,386 | $36,165 | $30,221 |

Black's actual net income, tax, and after-tax income, as shown on his tax return for the years from 1970 through

1. See footnote 2, *infra.*

1973, have been zero.[2] There is no evidence in the record that Black had any income, other than what was shown on his tax returns, during the years from 1969 through 1973, from employment as a Washington representative or from any other source.

The difference between Black's after-tax income, had his earnings continued at their pre-eavesdropping rate through 1973, and his actual after-tax income since the eavesdropping is as follows:

| Year | Projected After-Tax Income | Actual After-Tax Income | Difference Between Projected and Actual After-Tax Income |
|---|---|---|---|
| 1963 | $67,837 | $48,830 | $ 19,008 |
| 1964 | 85,248 | 40,074 | 45,174 |
| 1965 | 94,035 | 3,458 | 90,577 |
| 1966 | 94,035 | 2,538 | 91,497 |
| 1967 | 94,035 | 26,722 | 67,313 |
| 1968 | 84,834 | 37,441 | 47,393 |
| 1969 | 81,767 | 30,221 | 51,546 |
| 1970 | 105,650 | 0 | 105,650 |
| 1971 | 108,358 | 0 | 108,358 |
| 1972 | 108,358 | 0 | 108,358 |
| 1973 | 108,358 | 0 | 108,358 |
| | | Total | $843,232 |

Black's earnings from 1963 through 1965 are not in dispute since those years were involved in the prior civil tax litigation and the amounts shown were there determined. From 1965 until the present Black has been unable to obtain employment as a Washington representative, which is the area in which he had gained his very substantial livelihood for many years. As a ' result, during this period he has been living on borrowed money and has engaged in a number of speculative ventures involving the acquisition, development and promotion of a series of novel devices, including currency-counting, collecting, and changing machines. Acting through several corporate organizations, including Business Industries, Inc., Broach Systems, Inc., General Tool, and Automated Business Machines, Black obtained loans from several individuals and a bank. Ultimately all of these corporations failed and a default judgment in excess of 3 million dollars has been entered against Black, who was an endorser on the corporate notes to the bank. Most of the income shown on Black's tax returns for the years since 1965 was borrowed money which his tax attorney advised him to report as income. Black is presently seeking employment but has no present prospects of employment.

The Court concludes that for the business injuries to Plaintiff caused by the government's intentional interference with his privacy, damages will be assessed in the amount of $843,232.

 The FBI reports or the information contained therein have destroyed the Plaintiff's livelihood and permanently impaired his ability to obtain employment. However, there is no proof in the record concerning Black's life expectancy; thus, there is also no proof of the work-life expectancy of Black. The evidence about Black's age is in conflict. Therefore, the Court must conclude that any award of damages for loss of livelihood beyond the date of trial is speculative.

*Damages for Loss of Name, Reputation, Friends, and Business Associates, and for Mental Pain and Suffering, Embarrassment, and Humiliation*

 The FBI reports or the information contained therein have greatly damaged the Plaintiff's name and reputation and have caused him the loss of friends and business associates. At the time of eavesdropping Black was a successful Washington representative for major national corporations and a respected member of the community. Among his many friends and business associates were senators and congressmen, government officials, military officers, and business executives whom he saw frequently, both on business and social oc-

---

2. There is no evidence in the record sufficient to support any conclusion about Black's in-

come in 1974. Thus, the Court cannot make any determination of loss for the year 1974.

casions. Following the eavesdropping, and the public statement indicating that he had been eavesdropped upon by the FBI because of his "possible affiliation with organized crime", Black was dropped by his former friends and associates. He simply does not see any of his old friends anymore.

The FBI reports or the information contained therein have caused the Plaintiff great mental pain and suffering, embarrassment and humiliation. Since the eavesdropping Black has been under enormous mental and psychological stress and strain resulting from two trials for income tax evasion, the public linking of his name with "organized crime", the loss of all of his clients, friends, and associates, his continuing ability to obtain employment, the need to borrow money to support himself and his family, his inability to repay these loans, his enormous tax liability, and the fact that he has no prospects of obtaining employment or getting out of his present situation. His nervous system has been undergoing shock after shock. During this period Black has undergone psychiatric treatment and he has had trouble with his weight since around the time of the events following the eavesdropping. The eavesdropping has embarrassed and humiliated Black before people in Congress, both in the House and Senate, the executive branch of the government, including the military, the business community, the public and his own family.

The Court concludes that for these personal injuries to Black caused by the government's intentional interference with his privacy, damages will be assessed in the amount of $60,000.

*Other Causes of Plaintiff's Business and Personal Losses*

 The Court finds that there were other causes for Black's loss of livelihood and personal losses:

1. The criminal tax investigation and conviction of Black. The government conducted a criminal tax investigation of Plaintiff during 1960–62 in which many of Black's past employers were interviewed. During the grand jury proceedings in that case several past employers were subpoenaed to testify during February and March, 1963. Black was indicted on March 29, 1963. He was subsequently tried and convicted on charges of criminal income tax evasion on May 5, 1964.

2. The "Bobby" Baker investigation. On September 9, 1963, a complaint was filed against Black in the case of Capitol Vending Co., Inc. v. Robert G. Baker, in which Plaintiff was to be identified with Serv-U Corp., and in which allegations were made that Baker used his influence to obtain vending contracts in the aerospace industry. The Senate Committee on Rules and Administration investigated "Bobby" Baker relative to violations of law or conflict of interest. Plaintiff testified in these hearings on February 17, 1964.

3. Plaintiff was terminated for cause by North American Aviation on February 28, 1964, as a result of charges of conflict of interest.

4. The tax liens filed by, and the tax collection activity of, the Internal Revenue Service. The present civil tax liability of Plaintiff is about $900,000, including interest and penalties.

The Court concludes that some, and perhaps all, of these causes were foreseeable by the government when it engaged in the intentionally tortious invasion of Plaintiff's privacy. Indeed, these causes may well have been the results of, or aggravated by, the government's invasion of Plaintiff's privacy or the information obtained and published thereby. The Court is in no position to rule that these causes were "intervening causes" sufficient to obviate the Defendant's liability, since the Defendant has refused to allow discovery as ordered by the Court. In this case under these circumstances, the Court must draw adverse inferences from the government's refusal to allow discovery on the issues of whether the other causes of Black's losses were "in-

tervening causes". *See* PROSSER, TORTS (4th Ed.) § 44.

### Conclusion

The Court concludes that both personal and business losses may be recovered if those losses are the natural and proximate result of the tortious conduct. Prosser has recognized that special damages, including harm to the Plaintiff's commercial interests, may be recovered under an invasion of privacy theory. PROSSER, TORTS (4th Ed.) § 117.

The government's tortious interference with Black's right of privacy by intrusion and publication is one substantial cause, and the proximate cause, of the business and personal losses detailed herein. It is true that the government has offered some evidence tending to show that there were other contributing causes to these losses. These other causes were not, however, "intervening causes", since the government should have foreseen their risk when it illegally invaded the Plaintiff's privacy by intrusion and publication.

The Court concludes that the intentional nature of the tort, as well as the burden placed on Plaintiff at trial as a result of the government's refusal to comply with discovery orders of the Court, justify a recovery of the losses that Plaintiff has proved at trial. As stated by Prosser in his treatise:

> "There is a definite tendency to impose greater responsibility upon a defendant whose conduct has been intended to do harm or morally wrong. More liberal rules are applied as to the consequences for which he will be held liable, the certainty of proof required, and the type of damage for which recovery is to be permitted, as well as the measure of compensation. . . . [T]he defendant's liability is least where his conduct is merely inadvertent, greater when he acts in disregard of consequences increasingly likely to follow, greater still when he intentionally invades the rights of another under a mistaken belief that he is committing no wrong, and greatest

of all where his motive is a malevolent desire to do harm."

PROSSER, TORTS (4th Ed.) § 8.

This is a case in which there is no logical basis in the record for some rough practical apportionment limiting the Defendant's liability to only some part of the harm which Defendant has in fact proximately caused. Any division would be purely speculative and arbitrary. Thus, the law requires the Court to hold the Defendant for the entire loss, notwithstanding the fact that other causes may have contributed to it. In light of the considerations detailed above, those other causes were foreseeable to the government. Prosser, Torts (4th Ed.) §§ 44, 52.

In view of the foregoing, the Court awards Judgment for Plaintiff in the amount of $903,232.00 for his business and personal losses occasioned by the intentional, tortious conduct of the government.