Fred B. BLACK, Jr.

v.

SHERATON CORPORATION OF AMERICA et al.

Appeal of UNITED STATES of America.

No. 75–2039.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1976.

Decided Aug. 22, 1977.

---

See also 184 U.S.App.D.C. ——, 564 F.2d 550.

Neil R. Peterson, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and John J. Farley, III, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellant.

Gerald S. Rourke, Washington, D. C., for appellee, Black. Samuel M. Bradley and Edward P. Morgan, Washington, D. C., were also on the brief for appellee, Black.

Peter R. Sherman, Washington, D. C., entered an appearance for appellee, Sheraton Corp. of America, et al.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

Plaintiff is a Washington lobbyist who fell from grace in 1963–64. Plaintiff claims that his loss of employment and reputation was caused by government dissemination of information gained from an illegal eavesdrop in 1963. Plaintiff sought discovery of certain government documents in order to prove this theory. The government, which had disclosed logs of its surveillance and memoranda based thereon, declined to produce the particular documents except to the district court *in camera*. The district court rejected this request, required production, and following non-production it imposed sanctions, and ultimately held the government liable to the plaintiff for $903,232 in damages. In our view the government made a sufficient showing of a pertinent privilege to call upon the district court to undertake an *in camera* verification. We vacate the judgment and remand for further proceedings.

## I. BACKGROUND

### A. *Factual Background*

Plaintiff Fred B. Black, Jr. was a Washington lobbyist affiliated with Robert G. ("Bobby") Baker, Secretary to the Majority of the Senate. Black's average annual reported taxable income for the years 1958–62 was $216,000.

On February 7, 1963, FBI agents installed a microphone through the common wall of a room adjoining Black's suite at the Sheraton Carlton Hotel in Washington, D.C. By means of this device, the FBI agents secretly listened to Black's conversations and activities until April 25, 1963.

At about this time, Black was beset by a number of other difficulties. The IRS had been investigating him for income tax evasion for the past two years. In December of 1962, the IRS completed its investigation and recommended that the Justice Department undertake a criminal prosecution. Approval was sent to the U.S. Attorney in January of 1963, and Black was indicted on March 29, 1963.

In 1963 Black also became entangled in the Senate investigation of Bobby Baker. Both Black and Baker apparently owned interests in Serv-U Corporation. A competitor of Serv-U, Capitol Vending Corporation, filed suit against Black and Baker charging that the two had conspired to deprive Capitol of a contract with Melpar, Inc. The complaint alleged that Black had persuaded one of his major clients, North American Aviation, to pressure its subcontractor Melpar to deny the contract to Capitol.

Bobby Baker resigned from his office in October, 1963, and hearings were conducted in late 1963 and 1964. Black's testimony, which was released to the public on February 21, 1964, showed that he had a consulting contract with Melpar and an interest in Serv-U, both of which had contracts with North American Aviation. One week later North American fired Black for conflict of interest.

Three months later, Black was convicted of income tax evasion. That conviction was affirmed by this court in 1965. 122 U.S. App.D.C. 347, 353 F.2d 885 (1965). By this time Black was unable to obtain employment as a Washington representative, and his income for 1965 amounted to only $4,500.

In May of 1966, Solicitor General Thurgood Marshall advised the Supreme Court of the 1963 eavesdropping on Black's hotel suite, which covered conversations with his attorney. The Supreme Court vacated and remanded for a new trial. *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). Upon remand, the district court found in a suppression hearing that the government's evidence had not been derived from the eavesdropping. On retrial, however, defendant Black was acquitted.

## B. *Procedural Background*

Black filed this action in 1967 seeking monetary recovery for injuries allegedly caused by the concededly illegal eavesdropping operation. Black's amended complaint, filed in 1970, invoked theories of trespass, invasion of privacy by intrusion, invasion of privacy by publication and violation of constitutional rights. Black alleged that the information obtained by means of the eavesdrop had been disseminated to (1) the grand jury which indicted him for tax evasion; (2) his antagonists in the Capitol Vending suit; (3) the Senate Committee which investigated Black and Baker; and (4) various agencies of the federal government, which then allegedly "blackballed" Black with his former employers. Black further alleged that the government intended to use the information gathered by the eavesdrop to coerce Black into becoming an informer for an FBI investigation into organized crime in Los Angeles. Black sought damages for his loss of valuable contacts with major corporations, the destruction of his means of livelihood, his loss of his good name, and mental suffering and anguish.

A critical issue from the beginning of this litigation is the extent to which plaintiff may be permitted access to the FBI files. The FBI files contain several different types of documents. The FBI agents monitoring Black's suite kept contemporaneous logs in which they summarized or quoted from his conversations. These logs were submitted to their superiors, and the eavesdrop information was then included in "airtels"—internal FBI documents disseminated by the Washington field office to FBI headquarters and to various other field officers. When the Washington office felt that it had obtained a "lead," *e.g.*, the name of an affiliated individual, it asked the relevant field office to obtain more information, *e.g.*, the occupation or activities of the named individual. The field office then responded with an "airtel." Information obtained from the investigation was ultimately incorporated into two lengthy "reports," dated April 17, 1963 and July 12, 1963. These were transmitted by the FBI to the Criminal Division of the Justice Department. There were also two "memoranda" sent by the FBI to the Attorney General with copies to the Criminal Division. The FBI files on Black also included, of course, many documents of a noninvestigative nature—recommendations, evaluations, suggestions and documents related to the earlier criminal litigation and the current civil litigation.

At the outset, the United States made available to the plaintiff (1) all logs of the surveillance; (2) all summary airtels based on the logs and sent by the Washington Office to other locations; (3) the two memoranda from the director of the FBI advising the Attorney General of the information which had been obtained from the surveillance; and (4) those portions of the two FBI reports to the Criminal Division which contained information directly obtained from the surveillance.

In 1970 plaintiff sought to discover from the FBI the extent of the investigation of Black at the time the eavesdrop commenced, and the nature of the information which had been obtained from running down the leads gained from the eavesdropping. Judge Sirica held that these materials in the government file were privileged. *Black v. Sheraton Corp.*, 50 F.R.D. 130 (D.D. C.1970). He reasoned that the public interest in secrecy for investigative files outweighed plaintiff's "insufficient showing of necessity." He noted that the government had offered to permit plaintiff to depose any of its agents to discover whether they were furnished with information obtained from the surveillance. In this way Black was to trace the dissemination of the eavesdrop information.

In April, 1971, the government moved for partial summary judgment with respect to Black's claims that eavesdrop information had been disseminated to the grand jury, the Senate Committee and the Capitol Vending antagonists. The government presented affidavits and testimony from FBI personnel that none of the eavesdrop information had been disseminated to these

third parties and statements from the people involved that none had been received. Plaintiffs contended that he was unable to trace the eavesdrop material any further by means of depositions and that summary judgment in the absence of further discovery was unfair. The district court granted the motion for partial summary judgment and this court summarily affirmed. (D.C.Cir. No. 71–1639, Sept. 21, 1972).

The case was subsequently reassigned to Judge Richey, who held hearings on the still pending discovery motions. Plaintiff argued that because the FBI reports had been sent to the Organized Crime section of the Criminal Division, they may have been accessible to other law enforcement agencies. On this basis plaintiff claimed to have made a stronger showing of need for broader discovery.

On July 10, 1973, Judge Richey ordered the government to produce for inspection and copying:

(1) all documents containing leads obtained from the eavesdropping, including FBI reports of April 17, 1963 and July 12, 1963;

(2) all communications received in response to the eavesdropping material, including any airtels received by the Washington, D.C., Field Office of the FBI in response to airtels sent out by such office;

(3) communications between the Justice Department and FBI and Senate Rules Committee, and all communications between the Justice Department and FBI and any other agency of the executive branch, containing or relating to information obtained directly or indirectly from the eavesdropping upon the Plaintiff;

(4) all documents relating to the leaving in place of the microphone after April 25, 1963, and any subsequent activation of the microphone.

Because of a misunderstanding as to the scope of the district court's order, a supplemental hearing was held on July 31, 1973. At that time Judge Richey made clear that his order was intended to compel the government to produce the two FBI reports in their entirety. Apparently as an accommodation, however, he offered to make an *in camera* examination in the presence of both counsel, and to excise all irrelevant portions of the requested documents. Both parties would have to agree to be bound by his decision. Judge Richey stated that if the parties did not agree to this arrangement, he would stand by his original order.

This procedure proved unacceptable to officials of the Justice Department. By letter dated August 2, 1973, Acting Assistant Attorney General Irving Jaffe objected to the procedure on the grounds that production under these circumstances might reveal the name of a confidential FBI informant; that the presence of plaintiff's counsel at the *in camera* inspection was improper; that the district court erroneously sought to foreclose appeal; and that the procedure would preclude the Attorney General from making a formal claim of executive privilege.

In order to obviate these difficulties, Jaffe offered to produce the documents for an *in camera* inspection by the district judge alone. Under the terms of Jaffe's offer, neither counsel would be present; the United States would have a full opportunity to appeal before any documents were disclosed to plaintiff or his counsel; and the district court would accept the documents with the understanding that the Attorney General could assert executive privilege with respect to documents whose production was ordered.

The district court did not respond to this offer, and on September 28, plaintiff moved for sanctions for refusal to obey the discovery order. On October 19, the government responded with an affidavit of Attorney General Elliot Richardson, claiming executive privilege with respect to certain of the documents ordered to be produced.

The precise scope and basis for the Attorney General's claim of privilege are critical to this litigation. First, and most importantly, the Attorney General did not claim the privilege with respect to all of the docu-

ments in the file. He specifically "authorized the production, depending upon approval by [the district] court, of all material in the FBI file on plaintiff which was obtained indirectly as the result of any leads from the eavesdropping." This production was offered upon the sole condition "that none of the material involved would or would tend to identify any confidential informants of the FBI."

The Attorney General asserted executive privilege as to the remainder of the file. He explained that even though the criminal case against the plaintiff had been concluded, the eavesdropping had been undertaken for "intelligence" purposes, which would be compromised if the file were made public.[1] The Attorney General further asserted that disclosure of all the contents of the file might reveal intra-agency recommendations, disclose the investigative techniques of the FBI, and unfairly harm third parties.

After these general comments, the Attorney General divided the documents in the file into several categories: (1) materials obtained prior to the eavesdropping; (2) materials clearly not obtained as a result of the eavesdropping; (3) materials which overlapped with those derived from the eavesdropping, but gained from an independent source; (4) materials which would tend to reveal the identity of informants; (5) materials relating to secondary investigations of persons or entities other than the plaintiff; (6) intra-bureau and intra-departmental memoranda containing recommendations, evaluations, analyses and other intra-agency deliberations; (7) technical and administrative documents relating to the installation, operation, and dismantling of the monitoring station, which would tend to reveal procedures, investigative assessments and capabilities in national security cases; and (8) documents covered by other privileges, such as work products created during the revelation of the eavesdropping to the Supreme Court and during this case.

The Attorney General did not specify which documents in the file would be placed in which categories, nor did he say he had examined every document. He did say, however, that he had conducted a review of the file "sufficient to have personal knowledge that there are many documents in the file in each category."

Plaintiff quickly filed an opposition to the claim of executive privilege, arguing that it was invalid on both procedural and substantive grounds. Plaintiff pointed out that

The Court has ordered the Government to produce all documents containing information obtained by leads from the eavesdropping, and the Attorney General has agreed to do so. That is all that is involved here. The Government's attempt to claim some kind of executive privilege with respect to other material which plaintiff has not sought is just another smoke screen . . . . .

However, plaintiff argued that it would be impossible to tell whether a particular item was obtained from the leads from the eavesdropping or from sources totally independent of the eavesdropping. Plaintiff submitted that "the only party who can possible say whether a piece of information was obtained by a lead from the eavesdropping is the plaintiff himself, and that the procedures to be followed by the Court here should be based upon a recognition of that fact." Plaintiff therefore asked that the government be compelled to turn over to plaintiff the two FBI reports in their entirety plus all factual material in the file obtained after February 7, 1963.

In its reply, the government reiterated its offer to make the entire file available to the district court for *in camera* inspection. The government continued to insist that the plaintiff was not entitled to see the entire FBI Reports, but only those portions based on information derived from the eavesdrop. The government recognized the inspecificity of the affidavit of the Attorney General,

---

**1.** The Memorandum of the Solicitor General submitted to the Supreme Court in connection with Black's case stated that the FBI had authorized eavesdropping for intelligence purposes "when required in the interest of internal security or national safety, including organized crime, kidnappings and matters wherein human life might be at stake."

but argued that specific references to individual documents could be supplied at the time the documents were produced for *in camera* inspection.

On January 11, 1974, the district court advised the parties of its view that the claim of privilege was invalid, and on January 21, 1974, it issued an opinion explaining its holding and imposing sanctions. *Black v. Sheraton Corp.*, 371 F.Supp. 97 (D.D.C. 1974). The basis for the district court's holding was the inspecificity of the Attorney General's affidavit, the lapse of time since the termination of the investigation of plaintiff and the fact that the claim sought to shield from public view improper official conduct. As a sanction, the district court deemed admitted by the government that the FBI reports of information contained therein had destroyed plaintiff's livelihood, greatly damaged his name and reputation, and caused him great pain and mental suffering.

Subsequently, the district court issued an order clarifying the meaning of its sanctions. The court would view as established that plaintiff had made "a prima facie showing of causation in fact: that is, that the government conduct was a material element and a substantial factor in bringing about the business and personal losses to Black." The government would have the burden of showing that there were other independent causes; if the government could not show a logical and reasonable basis for apportionment, the United States would bear the entire loss. Order of October 24, 1974.

At the trial, Black testified that his inability to find employment resulted from government "blackballing." The government introduced the depositions of Black's former employers, who explained that he had been terminated because he was too slow, too expensive, ineffective or in a conflict of interest. There was also evidence introduced as to Black's income before and after the eavesdropping.

In a reported opinion, the district court awarded $903,232 in damages to Black. *Black v. United States*, 389 F.Supp. 529 (1975). The district court found that there were other causes for Black's loss of livelihood and personal suffering: the criminal tax investigation and conviction; the Bobby Baker investigation; the firing for conflict of interest by North American Aviation; tax liens filed by the Internal Revenue Service, now amounting to more than $900,000. The district court explained, however, that because of Black's lack of access to the FBI file, "it was unduly unfair to place upon the Plaintiff the burden of negating each of the other allegedly independent causes which the government asserts to have intervened and to have caused Black's business and personal damages." 389 F.Supp. at 534. The district court concluded that "some, and perhaps all, of these causes were foreseeable by the government when it engaged in the intentionally tortious invasion of Plaintiff's privacy. Indeed, these causes may well have been the results of, or aggravated by, the government's invasion of privacy or the information obtained and published thereby." 389 F.Supp. at 537. Drawing "adverse inferences" from the government's refusal to produce the documents the court held the United States liable for the full amount of Black's losses, $843,232 in business losses and $60,000 for loss of reputation, friends, embarrassment, humiliation and other mental suffering.

It is from this decision that the government currently appeals. It raises a multitude of objections to the proceedings in the lower court. Prominent among them are the contentions that the suit was barred by sovereign immunity; that the district court's order of July 10 permitting broader discovery effectively disregarded the earlier decision of the district court limiting such discovery; that the district court erroneously overruled the Attorney General's claim of executive privilege; that the sanctions for failure to produce were unfair as conceived and doubly unfair as applied; that the district court, without making a finding of credibility, erroneously credited the testimony of Black as against the depositions of all of his former employers; that the district court's calculation of damages failed to

take into account certain other income received by Black; and that the district court's judgment, placing the entire burden of loss on the government, failed to give any effect to the prior grant of partial summary judgment affirmed on appeal by this court.

## II. SOVEREIGN IMMUNITY

The government argues that plaintiff's claim for damages arising from the illegal eavesdropping is barred by the sovereign immunity of the United States. Since this objection is jurisdictional as well as substantive, *see* 28 U.S.C. § 1346(b) (1970), we resolve it before turning to the merits.

When Congress enacted the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1970 & Supp. V 1975), it "used neither intricate nor restrictive language in waiving the Government's sovereign immunity." *United States v. Muniz*, 374 U.S. 150, 152, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963). The United States was to be liable in tort "in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674. As a result of this language, "the Government's liability is no longer restricted to circumstances in which government bodies have traditionally been responsible for misconduct of their employees. The Act extends to novel and unprecedented forms of liability as well." *United States v. Muniz*, 374 U.S. at 159, 83 S.Ct. at 1856. *See also United States v. Neustadt*, 366 U.S. 696, 703, 708, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961); *Dalehite v. United States*, 346 U.S. 15, 31, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

There are, however, certain specified exceptions to this general waiver. These exceptions, listed in 28 U.S.C. § 2680, include:

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights. . . .[2]

These exceptions to liability must be read in light of the admonition of the Supreme Court: "There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it." *United States v. Muniz*, 374 U.S. at 166, 83 S.Ct. at 1859, *quoting Rayonier, Inc. v. United States*, 352 U.S. 315, 320, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

The district court in this case awarded damages to plaintiff invoking four overlapping theories of liability: trespass, invasion of privacy by intrusion, invasion of privacy by publication and violation of constitutional rights. 389 F.Supp. 529, 531 (1975). None of the theories which the district court invoked are among the exemptions from tort liability specified in the Tort Claims Act. The Supreme Court has recognized that the government may be sued on a claim of trespass. *Hatahley v. United States*, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *see also Dalehite v. United States*, 346 U.S. 15, 45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (dictum); *Ira S. Bushey & Sons, Inc. v. United States*, 276 F.Supp. 518, 526 (E.D.N.Y.1967), *aff'd*, 398 F.2d 167 (2d Cir. 1968). Similarly, because invasion of privacy does not fall within an enumerated exemption, it has been held that such a claim is not barred by the doctrine of governmental immunity. *Cruikshank v. United States*, 431 F.Supp. 1355 (D.Haw.1977) (alleged illegal opening of first class mail).[3]

---

**2.** On March 16, 1974, this section was amended to provide that with respect to "acts or omissions of investigative or law enforcement officers of the United States Government," the United States shall be liable for "any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h) (Supp. V. 1975). The claims involved in this

lawsuit arose prior to the enactment of the amendment, and it does not govern this case.

**3.** The court there reasoned:

If Congress had intended to include invasion of privacy among the other enumerated intentional torts in Section 2680(h), it could have done so three years ago when it amended the statute. See Act of March 16, 1974, Pub.L. 93–253, § 2, 88 Stat. 50. . . .

The government does not cite cases to the contrary. It relies on language contained in the Senate Report accompanying a recent amendment to § 2680(h). S.Rep.No. 93–588, 93d Cong., 2d Sess. (1973), *reported in* 2 U.S.Cong. & Admin.News, p. 2789 (1974). The Senate Report explained that "as a general principle," individuals whose rights were violated by federal law enforcement agents did not have an effective damages remedy against the federal government.[4] The Committee therefore recommended that the government's liability with respect to the acts of such agents be expanded to include such torts as assault, battery, false imprisonment, false arrest, malicious prosecution, and abuse of process.

We do not find the governments' citation of this Report persuasive. Read in its entirety, the Report indicates that the Committee viewed as clearly precluded by the doctrine of sovereign immunity only those torts with which the amendment was concerned, *e. g.*, assault, battery, etc. With respect to the theories of tort liability involved in this case, the Committee Report observed:

> The Committee realizes that under the Federal Tort Claims Act, Government tort liability for intentional conduct is unclear. For example, certain intentional torts such as trespass and invasion of privacy are not always excluded from Federal Tort Claims Act coverage. Obviously, it is the intent of the Committee that these borderline cases under the present law, such as trespass and invasion of privacy, would be viewed as clearly within the scope of the Federal Tort Claims Act, if the amendment is adopted.

*Id.* at 2791.

The Committee did not recommend any language to expand liability to cover these torts, apparently because it believed that, under a proper interpretation, the existing law provided for such liability. Given the Committee's expressed intention to maintain liability for trespass and invasion of privacy, and to expand liability for other constitutional torts, it would be a perversion of legislative history to rely on the Committee's inconclusive observations as to the state of prior law as a basis for denying recovery in this lawsuit.

On a somewhat different tack, the government attempts to recharacterize plaintiff's claim so as to demonstrate that it falls within one of the statutory exemptions. The government argues that because plaintiff seeks to recover for injury to his reputation, his claim is barred by the "libel" and "slander" exceptions of § 2680(h). Similarly, the government contends that because plaintiff seeks damages for the loss of employment allegedly resulting from government dissemination of the eavesdrop material, his claim is within the exception for "interferences with contract rights."

We disagree with these contentions because we believe that the government mistakes particular items of damages for the tortious wrongs alleged in plaintiff's complaint. Plaintiff is not simply suing for damage to his reputation and to his earning ability, he is suing for the physical trespass and unlawful invasion of his privacy that caused that damage. For this reason his claim is distinguishable from those in cases cited by the government, *e. g., Dupree v. United States*, 264 F.2d 140, 142 (3d Cir.), *cert. denied*, 361 U.S. 823, 80 S.Ct. 69, 4 L.Ed.2d 67 (1959) (complaint alleged "unreasonable, unjustifiable and negligent" interference with plaintiff's "right to obtain employment"); *Kessler v. General Services Administration*, 341 F.2d 275 (2d Cir. 1964) (libelous statements).

---

Invasion of privacy is not such a new cause of action, as the Government implies, that it can now be presumed to catch Congress by surprise.

4. The Committee Report may have been referring to judicial comments such as those of the Chief Justice in *Bivens v. Unknown Federal Narcotics Agents*, 403 U.S. 388, 421–23, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J.,

dissenting) or of Judge Anderson in *United States v. Artieri*, 491 F.2d 440 (2d Cir.), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 670, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974). Judge Anderson observed that while the Tort Claims Act barred damages for false arrest or imprisonment, "Congress intended the Government to be liable for trespasses." 491 F.2d at 446 n.2.

The distinction we seek to draw between the tortious wrong alleged in plaintiff's complaint and the items of damage flowing therefrom has been recognized by other courts. In *Quinones v. United States*, 492 F.2d 1269 (3d Cir. 1974), the court recognized a cause of action for negligence in maintaining personnel records and held that such a claim was not barred by the exemptions for libel and slander:

> In excluding certain tort causes of action from the Federal Tort Claims Act, Congress focused its attention upon the type of governmental activity that might cause harm, not upon the type of harm caused. In excluding actions in libel and slander, Congress, in our view, was not concerned with the difficulties involved in proof of injury to reputation, as the government here urges. Rather the concern was that government officials should not be hampered in their writing and speaking by the possibility that their actions would give rise to government liability.

492 F.2d at 1280. *See also Rogers v. United States*, 397 F.2d 12, 15 (4th Cir. 1968) (claim that U. S. Marshal negligently permitted plaintiff to be imprisoned and beaten "is founded on negligence even though assault or false imprisonment may be collaterally involved"). Since the Tort Claims Act does not give immunity for the type of activity in which the government was here alleged to be involved, *i. e.*, trespass and invasion of privacy, we hold that plaintiff's claim for damages arising therefrom is not barred.[5]

## III. EXECUTIVE PRIVILEGE

### A. *Introduction*

Before analyzing the merits of the issue of executive privilege, we pause to note some reservations about the use of that term in the context of this case. The Supreme Court has recognized a privilege for documents possessed by the executive that contain military secrets, *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), or the deliberations of high executive officials, *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Lower court decisions have dealt with claims of executive privilege in similar contexts. *E. g., Machin v. Zuckert*, 114 U.S.App.D.C. 335, 316 F.2d 336, *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963) (Air Force deliberations); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966), *aff'd mem. sub nom. V. E. B. Carl Zeiss, Jena v. Clark*, 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967) (deliberations within the Justice Department). In these situations, the claim of executive privilege may have constitutional underpinnings. *E. g., United States v. Nixon, supra*, 418 U.S. at 705–06, 94 S.Ct. 3090.

This case is not centrally concerned with diplomatic or military secrets, or with intragovernmental documents reflecting policy deliberations. Rather it concerns a claim of privilege based primarily on the harm to law enforcement efforts which might arise from public disclosure of FBI investigatory files. *Cf. Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (informer's privilege). Insofar as the term "executive privilege" is understood to refer to the situations described above or to be derived from constitutional principles, it might be more accurate to refer to the privilege claimed here as a "law enforcement evidentiary privilege."

For two reasons, however, we do not eschew the terminology and legal precedents for executive privilege. First, the privilege asserted here shares with those typically labelled "executive" a justification rooted

---

**5.** Carried to its logical extreme, the government's position in this case would dictate that neither the pedestrian suffering personal injuries as a result of government negligence nor business suffering damage to chattels as a result of a government trespass could recover for lost earnings, since in each case an alleged "interference with contract rights" would be involved. This is clearly inconsistent with existing law, *see, e. g., Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) (upholding damages for lost earnings in a wrongful death action and for loss of income in an action for trespass to chattels), and we reject this type of reasoning.

in the need to minimize disclosure of documents whose revelation might impair the necessary functioning of a department of the executive branch. The argument here—that law enforcement operations cannot be effective if conducted in full public view—is analogous to that made on behalf of intra-agency deliberations. Thus many of the principles and procedures involved in the more traditional executive privilege cases may be relevant here. Second, we are confronted here with a formal claim of privilege asserted by one of the highest officers of the government. This case—like other cases involving executive privilege—raises a question as to the deference which is to be given to such a claim of privilege and the manner in which it is to be handled.

While the executive privilege interests involved in this case do not have the constitutional dimension indicated in *Nixon* and *Reynolds*, they are rooted in common sense as well as common law. The various common law privileges are not undercut by the fact that they are subject to legislative reshaping and modification.[6] They share with each other, and with the constitutional privileges, the common matrix of pragmatic adjustment to needs of sound government. Hence we feel justified in drawing broadly on various executive privilege decisions and precedents, without exact refinement, for discerning a sound approach that will adjust the needs of both the judicial process and the executive branch.

In analyzing the issue of executive privilege in this case, it is also important to keep in mind the precise nature of the dispute between the parties. At the time the district court imposed sanctions, the plaintiff had in his possession the logs, the airtels sent out by the Washington Office, and portions of the FBI reports based directly on the logs. The Attorney General had authorized the production, depending upon court approval, of all material in the FBI file which was obtained indirectly as a result of leads from the eavesdropping. This would presumably include additional portions of the FBI reports and the airtels sent by FBI field offices in response to Washington. The plaintiff conceded that this was the material in which he was primarily interested, but argued that he could not be sure that the government was turning over all such material—that the material gained from the eavesdropping and that from other sources had become so intertwined that the government could not possibly do a fair job of separating the relevant material from that in which he was not interested. Plaintiff therefore claimed that he was entitled to see all documents placed in the file after the commencement of the eavesdropping. The Attorney General refused to produce those materials for plaintiff's counsel, although he was willing to produce the entire file for *in camera* inspection by the district court and a determination by the district court as to the proper scope of the privilege.

Thus, as we understand the posture of the case, the parties were at odds not about what materials were needed for the prosecution of plaintiff's claim, but about who should make the determination as to which documents were relevant. The government asked that the district court make such a determination *in camera*; the plaintiff insisted that he alone was capable of making this judgment. The district court ultimately overruled the claim of privilege and stood by its order of July 10, requiring the government to make available to the plaintiff the entire FBI reports and all airtels received by the Washington Office.

B. *Plaintiff's Claim That Executive Privilege Was Asserted In An Improper Manner*

The plaintiff presented, and the district court accepted, two alternative rationales for overruling the government's claim of privilege and imposing sanctions. 371 F.Supp. at 101. The first was procedural—that the claim of executive privilege had

---

6. *Soucie v. David,* 145 U.S.App.D.C. 144, 157, 448 F.2d 1067, 1080 (1971) (both majority and concurring opinions).

been improperly asserted. The second involved a substantive evaluation of the strength of the claim of privilege.

We turn first to plaintiff's procedural argument. Plaintiff contends that prior judicial decisions have established certain requirements which must be met before a claim of executive privilege will be recognized and sustained. Plaintiff relies heavily on language in *United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953):

> There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.

Plaintiff cites other cases for the requirements that the claim must specify with particularity the material which is felt to be privileged, *Thill Securities Corp. v. New York Stock Exchange*, 57 F.R.D. 133, 138 (D.Wis.1972), and must define the documents retained so as to bring them within the scope of the privilege, *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 326 (D.D.C.1966), *aff'd sub nom. V. E. B. Carl Zeiss, Jena v. Clark*, 128 U.S.App. D.C. 10, 384 F.2d 979, *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). Plaintiff then points out that the Attorney General did not state that he had reviewed every document for which the privilege was claimed, nor did he purport to classify individual documents. Plaintiff concludes that because the Attorney General's affidavit did not meet the requirement developed in the cases cited above, the district court was correct in ordering the production of the sought documents for inspection and copying.

■ We agree that where the executive seeks to withhold from the court documents relevant to a civil or criminal lawsuit, the claim of privilege must meet strict requirements. In that situation the court is relying on the affidavit of the responsible department head for the information pertinent to its decision concerning the privilege. It is therefore essential that the affidavit be based on actual personal consideration by the affiant official, that it specify the documents for which protection is sought, and that it explain why the specified documents properly fall within the scope of the privilege. Because these requirements were satisfied in *Reynolds*, the Supreme Court held that the documents in question there did not have to be turned over to the district court for *in camera* inspection.

In this case, however, the executive does not seek to shield the documents in question from judicial scrutiny, but has stated its willingness to tender them to the court *in camera*. The only purpose of the affidavit submitted by the Attorney General was to reserve the right to make more specific claims of privilege with respect to particular documents at the time they were submitted to the court.

■ In our view, the affidavit supplied in this case sufficed for this purpose. Since the district court would be able to examine the actual documents, it did not need an affidavit of the same degree of specificity as in a case where it was relying on the affidavit to decide whether valid grounds existed for assertion of the privilege. Nor did the district court need the personal assurance of the department head as to the proper classification of each document. What the situation required was the sworn statement of the appropriate Cabinet officer, justifying *in camera* analysis of the file.

The affidavit of Attorney General Richardson contained sufficient detail for this purpose. The Attorney General swore that he had personally examined many of the documents in the file and was convinced that their disclosure could harm law enforcement by revealing investigative techniques and by disclosing collateral investigations. The statement divided the documents contained in the file into several categories, and explained more specifically the harm that would result from the disclosure of each. While the Attorney General's affidavit clearly did not provide enough information for a judicial determination as to the scope of the privilege, it did alert the district court to the possibility of harm from the disclosure of some of the documents contained in the file.

In that circumstance, we believe that sound doctrine obligated the district court to examine the file *in camera.* In *Boeing Airplane Co. v. Coggeshall,* 108 U.S.App. D.C. 106, 280 F.2d 654 (1960), this court held that investigatory or other factual reports in the files of the Renegotiation Board were subject to discovery, but that policy recommendations were privileged. Recognizing that "Government documents [could not] easily be separated into fact finding and decision making categories," we remanded the case to the district court with the following observations:

> The papers in question are not, of course, before us. In fact, we have not even been apprised of the number of papers involved. We are in no position to offer exact guidance to the District Judge and to the parties. Initially the party under subpoena must decide which papers or portions thereof he will claim to be privileged. In the present case, where no military or state secrets are involved, and where the generally meritorious basis of the subpoena—including necessity—has been established, we think it proper for the District Judge to examine *in camera* the individual papers which are alleged to be privileged, and direct exclusions or excisions in a manner deemed lawful and appropriate . . . .

108 U.S.App.D.C. at 114, 280 F.2d at 662. We directed that a similar procedure be followed in *Machin v. Zuckert,* 114 U.S.App. D.C. at 340, 316 F.2d at 341, and in *Westinghouse Electric Corp. v. City of Burlington,* 122 U.S.App.D.C. 65, 73, 351 F.2d 762, 770 (1965). Summarizing these cases in *Freeman v. Seligson,* 132 U.S.App.D.C. 56, 405 F.2d 1326, 1339 n. 65 (1968), we said, "we have adopted the *in camera* inspection

as the procedure for accommodating claims of privilege where no military or diplomatic secrets are involved." [7]

We are aware that an *in camera* examination places a heavy burden of inspection and analysis on the trial judge. For this reason, in *Vaughn v. Rosen,* 157 U.S.App. D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), we required that a government agency claiming an exemption from disclosure under the Freedom of Information Act provide along with the documents to be examined a relatively detailed analysis in manageable segments and an index correlating statements made in that analysis to portions of individual documents.

We applied the techniques of *Vaughn v. Rosen* to a claim of executive privilege in *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 79, 487 F.2d 700, 721 (1973). In that opinion we overruled the President's generalized claim of executive privilege, but held that "With the rejection of his all-embracing claim of prerogative, the President will have an opportunity to present more particular claims of privilege, if accompanied by an analysis in manageable segments." 159 U.S.App. D.C. at 79, 487 F.2d at 721. That analysis was to contain descriptions specific enough to identify the basis of the particular claim or claims, without compromising the confidentiality of the information. On the request of either counsel, the district court was to hold a hearing in chambers on the challenged claim and to inspect the disputed items. If the district court felt that more detailed argument was necessary for effective consideration, it was authorized to give the Special Prosecutor access to the raw material.

> *In camera* inspection in executive privilege cases is appropriate where it appears with reasonable clarity that the party seeking production is entitled to access to some of the materials demanded. Examination in this type of situation enables the separation of what should be disclosed from what should not be revealed.

---

7. *Accord, Carl Zeiss Stiftung,* 40 F.R.D. at 331:
 > [I]n camera inspection should be afforded only where a suitable occasion therefor sufficiently appears. . . .
 > [C]ourts should not hesitate to make a private examination of disputed materials upon a reasonable showing that it can serve a purpose truly useful to a party actually or potentially entitled to some discovery, for in no other way can judicial responsibility be discharged. . . .

This approach to the mechanics of executive privilege was subsequently adopted by the Supreme Court in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973). There, after overruling the President's "generalized assertion of privilege," 418 U.S. at 713, 94 S.Ct. 3090, the Court held that the executive branch would be entitled to *in camera* inspection by the district court. 418 U.S. at 714–16, 94 S.Ct. 3090. At that time "[s]tatements that meet the test of admissibility and relevance must be isolated; all other material must be excised." 418 U.S. at 714, 94 S.Ct. at 3110. The Supreme Court recognized that questions might arise as to the excision of certain parts on grounds of relevance, admissibility, or a more specific claim of privilege, such as one based upon *United States v. Reynolds*, 341 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). 418 U.S. at 715 n. 21, 94 S.Ct. 3090. In that event, the Court noted, "it lies within the discretion of [the district court] to seek the aid of the Special Prosecutor and the President's counsel for in camera consideration of the validity of particular excisions." *Id.*

We think that the prior decisions of this court, particularly *Vaughn v. Rosen* and *Nixon v. Sirica, supra*, pointed to the proper method of resolving the disputed claim of privilege in this case. Even if the affidavit of the Attorney General was too imprecise to be used in a final determination of the scope of the privilege, it was adequate to reserve for the government an opportunity to interpose specific objections with respect to individual documents before their production was ordered. In our view, the proper course would have been for the district court to have accepted the proffered file for *in camera* inspection. At that time the government could have supplied an index correlating indexed items with particular claims of privilege. At that time the government could also have supplied an

analysis containing descriptions specific enough to identify the basis of the particular claim or claims. The plaintiff would have been permitted to see this analysis and take issue with its conclusions, but the court would make the final determination after an *in camera* examination of the documents. If this procedure proved unworkable, plaintiff's counsel might have been permitted limited access to the raw file. But until an attempt was made to resolve the issue in a less intrusive way, we think that disclosure should not have been ordered.[8]

### C. *Plaintiff's Claim That The Privilege Was Inapplicable*

We turn next to plaintiff's argument that the defendant's assertion of executive privilege was substantively invalid—that no purpose would be served by an *in camera* inspection because disclosure of the documents would not be harmful to any legitimate public interest.

■ Judicial recognition of an executive privilege depends upon "a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." *Nixon v. Sirica*, 159 U.S.App.D.C. at 74, 487 F.2d at 716. A "demonstrated, specific need" for material may prevail over a generalized assertion of privilege, *United States v. Nixon*, 418 U.S. at 713, 94 S.Ct. 3090, but the claimant must make "a showing of necessity sufficient to outweigh the adverse effects the production would engender." *Carl Zeiss, supra*, 40 F.R.D. at 328–29.

■ We begin with the proposition that there is indeed a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources. This principle was

---

**8.** Because we find that the district court erred in ordering the production of the disputed documents, we do not find it necessary to analyze fully the propriety of the sanctions that were imposed for noncompliance. We must acknowledge, however, that we have some doubts about the use of the sanctions invoked,

and the broad and sweeping presumption of causation, in a case that does not appear to be one of bad faith disobedience. The government had turned over some materials to the plaintiff, and its claim of privilege with respect to the remaining documents was substantial.

recognized in Judge Sirica's earlier decision in this case, *Black v. Sheraton Corp. of America*, 50 F.R.D. 130, 132 (D.D.C.1970), and in many other decisions, *e. g., Aspin v. Department of Defense*, 160 U.S.App.D.C. 231, 491 F.2d 24 (1973); *Jabara v. Kelly*, 62 F.R.D. 424 (E.D.Mich.1974); *Philadelphia Resistance v. Mitchell*, 63 F.R.D. 125 (E.D. Pa.1972). *See generally* 2 Weinstein's Evidence ¶ 509[07] (1975). Congress recognized the necessity for such a privilege in the Freedom of Information Act, which contains an exemption for certain types of investigatory records compiled for law enforcement purposes. 5 U.S.C. § 552(b)(7) (Supp. V 1975).[9]

The plaintiff does not challenge the general principle that law enforcement investigatory files contain privileged information. Rather plaintiff contends that in the circumstances of this case, the need to minimize disclosure was significantly diminished. Plaintiff calls attention to the ten year lapse of time between this litigation and the original investigation. Plaintiff also argues that the privilege cannot apply to such illegal activity as was involved here, or to investigations with a political purpose.

■ We reject plaintiff's contention that the public interest in nondisclosure can be disregarded simply because the principal investigation involved here has apparently been concluded. After this issue was argued to the district court,[10] but before its decision, this court rendered its en banc

decision in *Weisberg v. Department of Justice*, 160 U.S.App.D.C. 71, 489 F.2d 1195 (1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). We there upheld the application of the investigatory files exemption of the FOIA to materials concerning the assassination of President Kennedy, even though the dissent argued that "there is no indication that the Government contemplates the use of the information for law enforcement purposes." 489 F.2d 1204. In *Aspin v. Department of Defense*, 160 U.S.App.D.C. 231, 491 F.2d 24 (1973), we adhered to this holding, with the following explanation:

> It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired. Few persons would respond candidly to investigators if they feared that their remarks would become public record after the proceedings. Further, the investigative techniques of the investigating body would be disclosed to the general public.

*Id.* at 237, 491 F.2d at 30; *Accord, Frankel v. SEC*, 460 F.2d 813, 817 (2d Cir.), *cert. denied*, 409 U.S. 889, 93 S.Ct. 125, 34 L.Ed.2d 146 (1972); *Rural Housing Alliance v. United States Dep't of Ag.*, 162 U.S.App. D.C. 122, 128, 498 F.2d 73, 79 (1974).

We recognize that because FOIA may be invoked by any person without a showing of

---

**9.** The Freedom of Information Act currently exempts from disclosure

> investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel. . . . .

At the time of the district court's decision, this provision provided an even broader exemption for

> investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency. . . .

5 U.S.C. § 552(b)(7) (1970).

**10.** At the hearing on July 2, 1973, Tr. p. 30, plaintiff's counsel informed the court of the panel opinion in *Weisberg v. United States* (Feb. 28, 1973), which held that the FOIA exemption applied only where there was a prospect of enforcement proceedings. That opinion was vacated on April 22, 1973, and replaced by the opinion of the en banc court on October 24, 1973.

need for the requested information, experience under that statute may not always be relevant to discovery in other types of civil litigation. However, in this case the plaintiff has not made a persuasive showing of need for the particular documents which the government seeks to withhold. Plaintiff already possesses the logs from the eavesdropping, and has been offered all leads and other information indirectly obtained as a result of the eavesdropping. The only information which the government seeks to withhold is that gained from independent sources. The plaintiff claims that he needs to see these documents in order to determine whether the government has in fact turned over to him all those leads to which he is entitled. But, assuming that the function of verification could be handled by the district court *in camera*, we see no reason to make public these essentially irrelevant documents.

■ For analogous reasons, we are not persuaded by plaintiff's argument that executive privilege cannot be used to shield official misconduct. That may be taken as a generally sound principle, *see e. g., Rosee v. Board of Trade*, 36 F.R.D. 684 (N.D.Ill. 1965); *United States v. Procter and Gamble Co.*, 25 F.R.D. 485 (D.N.J.1960). However, the government has substantially complied with that requirement in the context of this case. The government has disclosed all material directly obtained for its misconduct, and has proffered all material indirectly derived. This disclosure should permit the plaintiff to achieve his objective of tracing the consequences of the illegal acts. We see no indication of a need for broader discovery. Indeed, in both of the cases cited by plaintiff in support of this argument, the district court undertook to examine the requested documents *in camera*, and to exclude or excise any material not bearing "directly" on the issue in litigation. *United States v. Procter & Gamble, Co., supra*, at 491; *see Rosee v. Board of Trade, supra*, at 688, 691.

■ Finally, we are not convinced by plaintiff's argument that no privilege could be claimed with respect to the documents at issue here because they were compiled for "intelligence" rather than evidentiary purposes. The use of the term "intelligence" is unfortunate, for it is clear in the factual context of this case that the information was being gathered in connection with an investigation of criminal activity (though not necessarily that of the plaintiff). The Solicitor General's memorandum stated that the "intelligence" operations authorized by the FBI were used to gather information on "organized crime, kidnappings and other matters wherein human life might be at stake." *See* note 1, *supra*. The fact that the information gathered for one of these purposes was not intended to be used in a prosecution of Black does not mean that it was not part of a legitimate law enforcement investigation, or that the privilege was inapplicable.

From this analysis of plaintiff's need for the disputed documents and the public's interest in confidentiality, we conclude that there is a reasonable likelihood that the file will contain some privileged material and that an *in camera* examination is necessary to resolve the dispute. We do not here purport to make a final determination with respect to any of the documents ordered to be produced. That is a task for the district court, after it has received an index and analysis, and after it has weighed plaintiff's need for particular documents against the public interest in nondisclosure. In those proceedings we expect that the government, as the party asserting the privilege, would bear the burden of proving its contentions—whether concerning the derivation of disputed material from an independent source or the applicability of some other privilege. While we recognize that this will also impose an arduous burden on our already overburdened district court bench, the task of reconciling the discovery needs of litigants with the needs of effective law enforcement requires this kind of judicial undertaking.

## IV. DAMAGES

Since we disagree with the district court's analysis of the claim of privilege and vacate

the sanctions imposed, it is not necessary for us here to discuss all of the government's other objections to the conduct of the trial. Nevertheless, to guide the district court on remand, and to encourage settlement by clarifying the central issues, we venture some comments on one other issue which we think especially important in resolving this case.

We believe that some part of the plaintiff's claim for damages was foreclosed by the partial summary judgment granted May 5, 1971 and affirmed by this court on September 21, 1972. In that judgment, Judge Sirica dismissed the paragraphs of Black's complaint which alleged that the eavesdrop data had been disseminated to the grand jury, the antagonists in the Capitol Vending suit and the Senate Committee. On appeal to this court, Black argued that the FBI airtels, which contained references to the grand jury and to various people who ultimately appeared before the Senate Committee, raised an inference that the FBI had disseminated eavesdrop information to these investigations. Black also relied on the deposition of Mr. William Hundley, discussing the disposition of the FBI reports with the Organized Crime Section, to show that there was a possibility that this information was transmitted outside the Department of Justice. The government presented detailed information on the dissemination practices of the FBI and affidavits from the dramatis personae in each event to the effect that no eavesdrop information had been transmitted or received. This court affirmed without opinion.

It is clear that the events covered by the grant of partial summary judgment contributed in some degree to Black's downfall and mental suffering. A lobbyist who has been indicted for criminal tax evasion is not likely to be viewed as an appropriate agent for the conduct of corporate business in Washington. A conviction for that crime obviously undermines a man's reputation, and probably his self-respect. At the same time, "Bobby" Baker's position was crumbling and Black was entangled in that investigation. Immediately after Black's testimony was disclosed, documenting his dou-

ble-dealings, North American Aviation, a source of Black's strength, fired him for conflict of interest. In all likelihood, the extensive publicity and unflattering revelations of the Senate Committee hearings undercut the "good will" of Black's personal service business and any expectancy that new employers would retain Black as a lobbyist. These events, all occurring in 1963–64, were unquestionably at least partially responsible for Black's downfall and suffering.

Indeed the district court specifically found, we think rightly, that the criminal tax prosecution, the Senate investigation and the North American Aviation firing were "causes" of Black's loss of livelihood and personal losses. 389 F.Supp. at 537. The district court decided, however, to place the entire burden of Black's losses on the United States, on the grounds that these other causes were "foreseeable" by the government when it engaged in tortious conduct and "may well have been the results of, or aggravated by, the government's invasion of Plaintiff's privacy or the information obtained and published thereby." *Id.*

We believe that the district court's decision with respect to damages gave too little weight to the earlier grant of partial summary judgment. We are aware of the general principle that a defendant whose conduct creates a foreseeable risk that an outside force will intervene and cause damage to plaintiff is to be held liable for the damage so caused. W. Prosser, A Handbook of the Law of Torts § 44 at 272–73 (1971). In the circumstances of this case, however, application of that principle was inappropriate. The grant of partial summary judgment established that the criminal prosecution and Senate investigation were not fueled by information from the eavesdrop operation, that they were completely independent and unrelated causes of Black's downfall. To put it another way, while the government's eavesdropping created a risk that the government would

use the information obtained thereby in an investigation or prosecution of Black, that risk never materialized. What did materialize were several forces—the Senate Investigation and the tax prosecution—resulting entirely from Black's own conduct. It is well established that the defendant is not liable where the harm results from an outside force, the risk of which is not increased by the defendant's conduct. Prosser, *supra*, at 275; Restatement (Second) of Torts § 435A (1965). We think that the final judgment in this case should have reflected the fact that Black's losses were at least partially caused by events not related to the government's eavesdropping operation.

In reaching this conclusion, we are not unaware of the doctrine of *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), that "where the defendant by his own wrong has prevented a more precise calculation," a factfinder may act upon "probable and inferential" proof to reach a "just and reasonable estimate of the damages." 327 U.S. at 264, 66 S.Ct. at 580. The situation before us, however, is one in which the defendant has demonstrated to the satisfaction of the trier of fact that there were completely independent causes of plaintiff's losses. The prior grant of summary judgment requires that the trier of fact limit the plaintiff's recovery to a "just and reasonable estimate" of the damages attributable to the defendant's conduct.

We cannot be confident what course this case will take upon remand, but if the United States should again be held liable for Black's financial losses or suffering, we think that some effort must be made to apportion damages between those causes related to the eavesdrop and those that were unrelated. We recognize that this task of allocation cannot be accomplished with certainty or precision, but the complex facts and unique procedural posture of the case require that we seek a solution that might be less than intellectually rigorous. We do not offer a suggestion here, because we have not had the benefit of the parties' arguments on this issue and because the extent of government dissemination remains to be retried. Nevertheless, should the proper occasion arise, we expect that after hearing the views of the parties, the district court will exercise its judgment to make a rough apportionment of damages to the various causes. However inexact such an allocation may be, we believe that it is the only way to give effect to the prior summary judgment and to achieve a fair result in this complex factual situation.

## V. CONCLUSION

Plaintiff Black has been continuously involved in litigation with the United States for the past 14 years. This lawsuit is now in its tenth year. Although many factual issues remain controverted, two points are clear: first, that the United States illegally trespassed and invaded plaintiff's privacy by means of an eavesdropping device installed in his hotel suite; and second, that there are other independent causes to at least a substantial extent of Black's financial reverses, loss of reputation and emotional suffering.

In this context, we think that both sides should recognize that complete vindication is impossible and that some imperfect compromise might well be the least expensive and the most satisfactory solution for all concerned. We recognize that after one has invested time and money at the level required by this litigation, it is difficult to accept a partial loss instead of a full victory. But pursuit of this litigation to its conclusion may well lead to a result no more just or satisfactory, in both moral and financial terms, than a settlement reached at this time. We trust in the ability of counsel and the wisdom of the district court to find a solution which provides the plaintiff with just compensation.

The case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*