Patrick A. TUITE, et al., Plaintiffs,

v.

Mark HENRY, et al., Defendants.

No. 94–268 (RCL).

United States District Court,
District of Columbia.

July 31, 1998.

William J. Harte, Chicago, IL, for Plaintiffs.

Anne L. Weismann, Caroline Lewis Wolverton, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

This matter comes before the court on remand from the United States Court of Appeals for the District of Columbia Circuit, *Tuite v. Henry,* 98 F.3d 1411 (D.C.Cir.1996), directing this court to consider the factors contained in *Frankenhauser v. Rizzo,* 59 F.R.D. 339, 344 (E.D.Pa.1973), with respect to plaintiffs' Motion to Comply with Subpoena served on Michael Shaheen, Jr., Counsel for the Office of Professional Responsibility of the Department of Justice ("OPR"). Upon consideration of the submissions of the parties and the relevant law, including the decision by the Court of Appeals, plaintiffs' Motion to Comply, on Remand, with Subpoena Dated July 20, 1994 is denied.

### I. *Background*

Attorneys for the defendants in the criminal case *United States v. Infelise,* No. 90 CR 87, 1991 WL 246575 (N.D.Ill.1991), alleged that certain conversations with their clients conducted in a private room on the nineteenth floor of the Metropolitan Correctional Center ("MCC"), the federal jail in Chicago, were improperly recorded.[1] In August 1991, copies of a cassette tape recording containing these privileged conversations were delivered to the attorneys who now stand as plaintiffs in the matter presently before this court. *United States v. Infelise,* 1991 WL 246575 (N.D.Ill.1991). Upon receiving copies of the tapes, the attorneys notified the Chief Judges of the District Court for the Northern District of Illinois and the Court of Appeals for the Seventh Circuit, as well as the United States Attorney for the Northern District of Illinois. The Office of Professional Responsibility of the Department of Jus-

---

1. Defendants in *United States v. Infelise,* 90 CR 87, 1991 WL 246575 (N.D.Ill.1991) were members of the Ferriola Street Crew, an operating outfit of the Chicago mob. These defendants were involved in illegal gambling businesses, loan sharking, bribery of public officials, subornation of jurors, and murder among other illegal efforts engaged in by their criminal enterprise. *United States v. DiDomenico,* 78 F.3d 294, 298 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1986). The defendants were tried and found guilty of most of the counts of the indictment in the federal district court for the Northern District of Illinois. *Id.*

tice ("OPR"), in conjunction with the United States Attorney's Office for the Northern District of Illinois, began an investigation to determine who made the tapes at issue.

During the course of the investigation, OPR requested that the investigatory files remain under seal and this request was granted by Judge Ann Williams of the Northern District of Illinois, the judge presiding over the criminal trial. At the conclusion of the criminal trial, the attorneys whose conversations were taped filed a civil suit in the federal district court for the Northern District of Illinois claiming that the taping violated federal wiretapping laws and the Constitution. *Tuite v. Henry*, No. 93–C–3248 (N.D. Ill. filed May 28, 1993).

Despite the Court of Appeals for the Seventh Circuit's noting that the final OPR report generated during the course of the investigation into this matter "indicated that the investigation had been totally inconclusive," with respect to who was responsible for the alleged taping, *United States v. DiDomenico*, 78 F.3d 294, 298–99 (7th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996), the attorneys, now plaintiffs, subpoenaed this report. OPR refused to comply with this subpoena and asserted the law enforcement investigatory privilege, the deliberative process privilege, and other evidentiary privileges.[2] Plaintiffs then filed a motion in this court seeking to compel OPR to produce the investigatory report at issue. *Tuite v. Henry*, Misc. No. 94–268 (D.D.C. Oct. 6, 1995).

This court denied the motion to comply, finding that the government properly raised the law enforcement investigatory privilege and that plaintiffs failed to demonstrate sufficient need to overcome this privilege. This court dismissed plaintiffs' action without prejudice and indicated that plaintiffs could renew their claim upon a more fully developed showing of need.

Plaintiffs appealed this court's decision to the United States Court of Appeals for the District of Columbia Circuit. The Court of Appeals affirmed this court's determination that OPR properly asserted the law enforcement investigatory privilege, but remanded the case for further consideration of the applicability of this privilege under the standard established in *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973), as cited in *In re Sealed Case*, 856 F.2d 268, 272 (D.C.Cir.1988). The Court of Appeals instructed this court to consider the information contained in plaintiffs' declarations which stated that contrary to defendants' claims, plaintiffs never received a list of people with access to the MCC room and that there were no effective alternative means of obtaining the information in the OPR report, along with any other facts that would facilitate a weighing of the competing interests in this case. *Tuite*, 98 F.3d at 1419. With these considerations in mind, the court again turns its attention to plaintiffs' motion.

## II. *Analysis*

### A. *The Law Enforcement Investigatory Privilege and the Frankenhauser Standard*

Plaintiffs' subpoena seeks all documents, including reports and memoranda, concerning the alleged taping of attorney-client communications at the MCC in the criminal case of *United States v. Infelise*. As stated, in response to this subpoena, OPR asserted that the law enforcement investigatory privilege permitted OPR to withhold these documents from production. The federal law enforcement privilege is a qualified privilege designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement. The privilege serves to preserve the integrity of law enforcement techniques and confidential sources, protects witnesses and

---

**2.** Although OPR raised several privileges to justify withholding the report at issue, OPR claims that all the documents comprising the report are covered by the law enforcement investigatory privilege. As Michael J. Shaheen, Jr., Counsel on Professional Responsibility with OPR, stated "[a]ll of the documents requested [by plaintiffs] are contained in OPR's investigative file of the taping incident. This file was compiled as OPR investigators gathered information, including materials provided by other law enforcement agency working on the investigation. Much of the file consists of, or discusses, witness interviews or testimony ... *[A]ll of the materials are subject to the law enforcement investigatory privilege.*" Shaheen Dec. ¶ 9 (emphasis supplied).

law enforcement personnel, safeguards the privacy of individuals under investigation, and prevents interference with investigations.

In the instant case, this court has already determined that OPR properly asserted the law enforcement investigatory privilege and this determination was affirmed by the Court of Appeals. Because this is a qualified privilege, its application necessarily requires a court to weigh the government's interests in ensuring the secrecy of the documents in question against the need of the adverse party to obtain discovery. The court in *Frankenhauser* listed several factors which, although not exhaustive, are useful in making this determination: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is nonfrivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case. 59 F.R.D. at 344. *See also In re Sealed Case*, 856 F.2d at 272.

The court has considerable leeway weighing these factors in the undertaking of the essential balancing process and the nature of the case presented may warrant consideration of additional factors. *In re Sealed Case*, 856 F.2d at 272. Moreover, it is appropriate to conduct the balancing test for determining whether the law enforcement privilege applies with an eye towards disclosure. As the Supreme Court has stated "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search the truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). *See also Miller v. Pancucci*, 141 F.R.D. 292, 300 (C.D.Cal.1992) ("This balancing test has been moderately pre-weighted in favor of disclosure.").

### B. *Application of the Frankenhauser Factors*

1. *The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information*

OPR contends that disclosure of the report in this case will thwart OPR's ability to conduct effective investigations by discouraging citizens from providing information in the future. Opp. to Pls.' Mot. to Comply at 11. OPR cites the amended declaration of Michael J. Shaheen, Jr., Counsel on Professional Responsibility with OPR in support of this position. Paragraph 11 of Shaheen's declaration most directly bears upon this *Frankenhauser* factor:

It is OPR's practice not to reveal the substance of its investigations. This policy rests on OPR's mission to investigate extremely sensitive allegations involving public corruption and official misconduct. The ability of OPR to conduct its own inquiries and investigations depends on the cooperation of Justice Department employees and individuals outside the Department who may be questioned concerning a particular matter. It is the policy of OPR, which is expressly or impliedly understood by all those we interview, that the information provided by interviewees will be strictly protected as confidential and will be disseminated, if at all, only to those within the Department of Justice with a strict "need-to-know." Witnesses in such investigations are especially concerned that their statements remain confidential because the targets are often powerful individuals or fellow employees. Similarly, the information given by witnesses often is unflattering to the witness or third-party employees. In my experience as Counsel for

Professional Responsibility our ability to honor the understanding of confidentiality between ourselves and our interviewees is absolutely essential to the success of OPR's operations. Without such protection, many individuals with relevant information simply would not come forward or would not speak to us candidly. Indeed, a potential interviewee's *perception* of our ability to honor the promise of confidentiality given to him/her or a prior interviewee, or his/her perception of our ability to limit access to the information provided without such a promise, is as important, in my judgment, as the *reality* of our ability to honor such a promise. If a person who has not yet come forward with relevant information fears that what he/she may relate to us can be released to those without a "need-to-know"—no matter how baseless that apprehension may be—then that person will often simply not talk to us or will temper his/her candor. Such individuals do not, and often are not capable of, drawing the distinction between a release ordered by a court pursuant to discovery motions and a release made by persons in OPR for other reasons. Regardless of the reason, that individual would know that information previously furnished to OPR by some prior interviewee was released—and that knowledge alone would be enough to chill his/her willingness to speak to us. Since ... the investigative file in this case contains a significant amount of information obtained from interviews and other sources, I am of the opinion that disclosure of that file could severely impede the ability of OPR to conduct future investigations.

Shaheen Dec. ¶ 11.

Plaintiffs contend that paragraph 11 of the declaration contains three shortcomings that undercut OPR's assertion that disclosure will thwart OPR's ability to conduct effective investigations. Plaintiffs argue that OPR has failed to make a specific showing of why disclosure would impede future investigations and therefore, reliance on such a general showing would permit OPR to defeat document requests indefinitely. Plaintiffs also state that OPR's position is flawed "because it is unrealistic to conduct any type of crimi-

nal investigation for the purpose of determining the perpetrator(s) of an illegal act ... and 'promise' those persons interviewed in light of the stated purpose that what they say will be kept confidential within the OPR." Reply to Opp. to Pls.' Mot. to Comply at 6. In this regard, plaintiffs assert that prosecutors would be required to disclose the information contained in an OPR investigative report if a determination was made to pursue a criminal prosecution. Finally, plaintiffs contend that OPR's concerns could be minimized by redacting what it believes are the sources of the information received or identities of witnesses.

Many courts have stressed the fact that "broad speculations of harm potentially flowing to the officers involved in generating the withheld documents are simply insufficient to support a finding of privilege." *Torres v. Kuzniasz*, 936 F.Supp. 1201, 1211 (D.N.J. 1996). Indeed, in some cases, courts have substantially discounted suggestions by law enforcement agencies that disclosure in certain cases will adversely affect future investigations. *See e.g., id.* (concluding that memorandum detailing impact of disclosure of internal affairs investigation failed to demonstrate that "particularized harm [would] result from disclosure of the withheld documents"); *Burke v. New York City Police Dept.*, 115 F.R.D. 220, 229 (S.D.N.Y. 1987) ("[T]he harm envisaged by the Department to its ability to conduct internal investigations is, at best, quite speculative."); *Spell v. McDaniel*, 591 F.Supp. 1090, 1117 (E.D.N.C.1984) ("[T]his court does not believe that the infrequent instances of court-ordered disclosure made after considered application of a detailed balancing test would deter citizens from revealing information to the police."); *Crawford v. Dominic*, 469 F.Supp. 260, 264 (E.D.Pa.1979) ("I do not accept the general proposition that citizens or fellow police officers will be less likely to give information concerning a police officer's conduct because in a few instances that information may be used in a later lawsuit."); *Frankenhauser*, 59 F.R.D. at 344 ("[W]e do not believe that rare instances of disclosure pursuant to a court order made after application of a balancing test comprising de-

tailed standards such as those enumerated here would deter citizens from revealing information to the police.").

Although this court agrees with this line of cases to the extent that these cases require the agency asserting the law enforcement investigatory privilege to demonstrate particularized harm, the court is less confident than the courts in the above-cited cases that disclosure of the type sought here would not deter citizens from providing the investigatory agency at issue with essential information. The harm identified by OPR is neither speculative nor conclusory. As quoted above, Shaheen states in his declaration that "[i]n my experience as Counsel for Professional Responsibility, our ability to honor the understanding of confidentiality between ourselves and our interviewees is *absolutely essential to the success of OPR's operations.*" Shaheen Dec. ¶ 11 (emphasis supplied).

The court is unable to simply discount the weight of the declaration offered by Shaheen in determining whether OPR has demonstrated that disclosure will result in particularized harm to governmental processes. *Compare Crawford,* 469 F.Supp. at 264 ("I do not accept the general proposition that citizens or fellow police officers will be less likely to give information concerning a police officer's conduct because in a few instances that information may be used in a later lawsuit."). OPR investigations of the sort conducted in this case depend in large part upon the cooperation of witnesses who may be questioned concerning highly sensitive matters. Shaheen Dec. ¶ 11. Given the sensitive nature of the investigations typically conducted by OPR, the importance of the assurance of confidentiality is apparent. Absent the ability of OPR to maintain this confidentiality in all but the most severe cases, it is logical to conclude that witnesses would indeed be less forthcoming and more reticent in their dealings with OPR. This threat of harm is particularized and not merely speculative for "[i]t is where the proper work of a government agency depends upon secrecy that claims of executive privilege will be looked upon with greatest favor." *Crawford,* 469 F.Supp. at 264.

### 2. *The impact upon persons who have given information on having their identities disclosed*

The potential harm to individuals who have provided OPR with information in having their identities disclosed cannot be understated in this case. Shaheen's declaration states that a confidential informant assisted investigators in this case and that this informant and other witnesses would face retaliation if their identities were disclosed. Shaheen Dec. ¶ 12, 24. The declaration indicates that even if the names were to be redacted, the identities of the informant could be determined by a knowledgeable individual from the unredacted portions of the report. *Id.* ¶ 24 ("The substantive information contained in each document would permit a knowledgeable individual to identify the source even if the name were redacted."). It is also submitted that even absent any identification of the informant or other witnesses, a full description of the particular harms that could be caused by disclosure in this case would itself reveal the identity of the informant and the other witnesses. *Id.* ¶ 12.

Plaintiffs argue that "[f]undamental fairness principles require the disclosure of the documents relating to some or all of OPR's confidential sources who were consulted in its investigation of the·taping of plaintiffs and their imprisoned clients." Reply to Opp. to Pls.' Mot. to Comply at 7–8. Notwithstanding this claim, there exists a strong interest in not disclosing confidential information when disclosure could result in harm to a witness in the investigation. *See Black v. Sheraton Corp. of America,* 564 F.2d 531, 545 (D.C.Cir.1977) ("We begin with the proposition that there is indeed a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources."). The public interest in preserving the anonymity of these individuals, whose effectiveness and lives may very well be at risk, is best served by the withholding of any and all identifying information from these reports. The severity of the harm that these individuals could encounter at the hands of the defendants in the criminal case and OPR's extensive reliance on information provided by confidential

witnesses weigh heavily against disclosing the OPR report.

3. *The degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure*

OPR states that the document at issue does not implicate a governmental self-evaluation plan. The absence of the implication of such a plan mitigates in favor of disclosure.

4. *Whether the information sought is factual data or evaluative summary*

OPR asserts that a large portion of the materials in the investigative report are summaries of witness interviews which reveal the investigators' interviewing techniques and evaluative processes, as well as what the investigators found to be significant. Shaheen Dec. ¶ 18. In response, plaintiffs state that they are seeking only factual information and are willing to have any evaluative summaries and recommendations excised from the documents by the court.

Despite plaintiffs' request to excise any evaluative summaries from OPR's report, the court recognizes that as a practical matter, it is almost impossible to separate the factual data within a report from evaluative materials. *See King v. Conde*, 121 F.R.D. 180, 193 (E.D.N.Y.1988) ("Courts should not expend too much effort trying to distinguish 'factual' from 'evaluative' information ... This distinction is likely to be quite elusive and often arbitrary."); *Rodriquez v. City of New York*, 1987 WL 17466, *2 (E.D.N.Y. Sept. 22, 1987) (noting the difficulty of distinguishing between factual data and evaluative material); *In re Franklin Nat'l Bank Secs. Litig.*, 478 F.Supp. 577, 583 (E.D.N.Y.1979) (same). Given the difficulty in separating factual and evaluative materials, most courts weigh this factor in light of the relevant importance of the materials to plaintiffs' case.

Typically, courts require reports containing both factual and evaluative materials to be disclosed in civil rights actions brought pursuant to 42 U.S.C. § 1983. In such cases, the evaluative material may be the best evidence available of the state of mind of the defendant and exempting the evaluative materials from discovery "might well bar jury scrutiny of highly relevant evidence which cannot be adequately developed in any other way." *Crawford*, 469 F.Supp. at 265. The rationale supporting the disclosure of this material was best described by the court in *King*, 121 F.R.D. at 192. In *King*, the court rested its decision to permit disclosure of materials that included evaluative summaries on the fact that when the summaries were created "the possibility of disclosure to civil rights plaintiffs [was] probably not of great import to the officers at the time they file[d] their reports." *Id.* The court explained that "[a]n officer's incentives to hide a friend's misconduct, or to be scrupulously forthcoming lest he be disciplined for having concealed information, are probably much more closely tied to the internal investigative machinery than to the fear of civil rights litigation." *Id.* With these considerations in mind, the court concluded that disclosure would not impact the inclusion of truthful evaluative or deliberative materials in officers' reports.

In the instant case, the concerns are significantly different than those espoused in the typical § 1983 lawsuit filed against a governmental agency. The report compiled by OPR contains summaries of the investigation and witness interviews, the disclosure of which would reveal law enforcement techniques and investigative evaluations. Shaheen Dec. ¶¶ 14, 16, 18, 20. Unlike the information courts order disclosed in a § 1983 lawsuit, it is highly probable that potential disclosure of the information contained in the OPR report was an extremely important factor considered by the individuals responsible for the drafting of the report.

An additional consideration also supports the conclusion that this factor does not weigh in favor of disclosure. As will be discussed below, the information contained in the report is of little use to plaintiffs in proving their allegations. *Compare Bouchard v. Bandy*, 1992 WL 346859, *1 (E.D.Pa. Nov. 10, 1992) ("Where, as here, a plaintiff claims a civil rights violation, supervisory evaluation may be the best evidence available of the state of mind of the defendant."); *Cameron v. City of Philadelphia*, 1990 WL 151770, *4 (E.D.Pa. Oct. 4, 1990) ("While the materials

are evaluative in nature, the importance of the information contained in these documents to Plaintiffs' civil rights action is critical."); *Crawford,* 469 F.Supp. at 265. Contrary to plaintiffs' suggestion, it is the conclusion of the court that this factor does not weigh in favor of disclosure.

5. *Whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question*

Plaintiffs are not the subjects of a pending criminal proceeding and OPR has made no showing regarding whether these individuals or their criminal-defendant clients may be the subjects of any future criminal proceeding relating to the alleged incident.

6. *Whether the investigation has been completed*

OPR has concluded its criminal inquiry into the alleged taping of plaintiffs' conversations with their clients at MCC. However, OPR states that the investigation is subject to reopening upon discovery of new information. OPR asserts that the fact that the criminal investigation has been completed should not definitively weigh in favor of disclosure.

In making this assertion, OPR cites *Black v. Sheraton Corp. of America,* 564 F.2d 531 (D.C.Cir.1977), for the proposition that the public interest in nondisclosure of law enforcement investigatory materials may not be disregarded "simply because the principal investigation [ ] has apparently been concluded." *Id.* at 546. In *Black,* the Court of Appeals considered the law enforcement investigatory privilege in the context of claim brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552, and stated:

It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired. Few persons would respond candidly to investigators if they feared that their remarks would become public record after the proceedings. Further, the investiga-

tive techniques of the investigating body would be disclosed to the general public.

*Black,* 564 F.2d at 546 (quoting *Aspin v. Department of Defense,* 491 F.2d 24, 30 (D.C.Cir.1973)).

The reasoning employed by the Court of Appeals in *Black* is applicable in the instant case. While the public interest in nondisclosure may lessen somewhat at the conclusion of a criminal investigation, it does not dissipate entirely as plaintiffs suggest. Indeed, in the present case, the interest in nondisclosure remains strong despite the conclusion of the investigation due to the very nature of the investigation.

7. *Whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation*

OPR states that no interdepartmental disciplinary proceedings have arisen or are likely to arise from OPR's investigation of the alleged taping at MCC. Therefore, this factor weighs in favor of disclosure.

8. *Whether the plaintiffs' suit is nonfrivolous and brought in good faith*

OPR does not contend that plaintiffs' suit is frivolous or brought in bad faith. Although there is no dispute on this issue, at least one court has cautioned that courts analyzing an assertion of law enforcement investigatory privilege under the *Frankenhauser* factors must take into consideration the availability of sanctions contained in Rule 11 of the Federal Rule of Civil Procedure in assessing this particular factor. In *Everitt v. Brezzel,* 750 F.Supp. 1063, 1068 (D.Colo. 1990), the court explained that a defendant should not be able to resist disclosure of investigatory files on the ground that a plaintiffs' claims were frivolous or brought in bad faith, thereby deflating this factor of much of its worth. The *Everitt* court persuasively added that if a defendant believed that a lawsuit had been filed in bad faith, the proper course of action is to promptly move to dismiss the complaint and to seek sanctions under Rule 11. Accordingly, the court will weigh this factor in light of the considerations expressed by the court in *Everitt.*

9. *Whether the information is available through other discovery or from other sources*

In the Memorandum Opinion and Order of October 6, 1995, this court concluded that plaintiffs could not overcome the law enforcement investigatory privilege because plaintiffs failed to demonstrate that they were unable to elicit the information by other means. *Tuite v. Henry*, Ms. No. 94–268, Mem. Op. and Order at 6 (D.D.C. Oct. 6, 1995). As will be demonstrated, in their subsequent filings with this court, plaintiffs have failed to take any steps to demonstrate that the discovery sought—the factual information contained in the OPR report—is unavailable from other sources.

Plaintiffs make no showing capable of rebutting the inescapable conclusion that they have made no effort to determine whether the discovery sought is available elsewhere. The discovery pursued by plaintiffs in this matter is as follows. On March 29, 1994, plaintiffs served their first set of written discovery requests on defendants. On June 6, 1994, plaintiffs subpoenaed documents relating to the taping incident from the Chicago office of the Federal Bureau of Investigation ("FBI"). When plaintiffs were apprised by the FBI that the General Counsel of OPR was the more appropriate person to subpoena to obtain the FBI's report on the alleged taping incident, plaintiffs served the subpoena presently at issue. On June 20, 1994, a second set of discovery requests was sent to defendants. *No other discovery has been conducted.*[3] Reply to Opp. to Pls.' Mot. to Comply at 13–14.

Plaintiffs contend that defendants' discovery responses provided plaintiffs with "little" and "minimal" information with respect to the alleged taping incident. *Id.* at 14. In their responses to plaintiffs' interrogatories and requests for documents, defendants generally deny any involvement in the alleged taping, indicate that they have no recollection of which individuals had access to the nineteenth floor at the MCC, and state that they do not possess any documents related to the incident. *See* Pls. Mot. to Comply Ex. E(B). Plaintiffs were, however, provided with specific responses concerning how they could acquire information detailing which individuals had access to the nineteenth floor of MCC. *Id.* In their responses, defendants identified specific individuals and offices at the MCC that would possibly possess information relevant to their inquiry.

Despite being provided with this information, plaintiffs made no efforts to pursue this avenue of discovery. This conclusion is supported by the declaration submitted by Linda A. Wawzenski, the Assistant United States Attorney in the Northern District of Illinois assigned to this case. Wawzenski's declaration states that she has not received notice of the issuance of any subpoena on the MCC, any of the MCC officials, the Bureau of Prisons, or any other person or entity other than the defendants in this case and the subpoena served on OPR. *Id.* ¶¶ 4, 5.

In explaining their decision to subpoena OPR rather than attempt to obtain the information from the MCC, its offices, or its employees, plaintiffs lamely state that they "decided it would be prudent to attempt to obtain the central documents in this case before deciding whether to depose these individuals or any other individual, especially if any of the names mentioned in the discovery responses corresponded with the investigative file created by OPR. Any other skilled trial lawyer would have done the same." Reply to Opp. to Pls.' Mot. to Comply at 14. Such a statement provides little incentive for the court to alter the conclusion reached in the Memorandum Opinion and Order of Oc-

---

**3.** There is a dispute between the parties surrounding OPR's identification of Guy R. Legal, a former employee at MCC, as a witness who recalled seeing what may have been an object protruding from the ceiling in the room where the alleged taping occurred. OPR states that the interview with Legal was brought to the attention to the judge presiding over the *Infelise* case, Judge Ann Williams, and that Judge Williams decided to disclose this report to the defendants and their counsel in that case. Shaheen Dec. ¶ 7. However, plaintiffs deny ever receiving this information. Plaintiffs also contest defendants' and OPR's suggestion that they should have subpoenaed the Bureau of Prisons. Plaintiffs state that subpoenaing the BOP would be fruitless as the BOP did not conduct an investigation into this matter and possesses no relevant information.

tober 6, 1995—"Plaintiffs have attempted, understandably, to save themselves considerable time and expense by directly eliciting, through their subpoena, information from OPR that they would otherwise need to investigate on their own." *Tuite,* Mem. Op. and Order at 4.

In remanding this case, the Court of Appeals stated that this court should consider the information contained in declarations submitted by plaintiffs when examining this *Frankenhauser* factor. *See* Pls.' Mot. to Comply with Subpoena Ex. E(A). These declarations were filed in conjunction with plaintiffs' Motion to Strike Portions of [OPR's] Brief, or Alternatively Consider Declarations. Plaintiffs' motion contests statements included in OPR's brief on appeal indicating that the government provided plaintiffs with a list of persons who had access to the room on the nineteenth floor of the MCC. OPR included these statements in their brief in reliance on language contained in the opinion issued by the Court of Appeals for the Seventh Circuit in connection with the appeal of certain issues in the underlying criminal case. *See DiDomenico,* 78 F.3d at 300 ("The district judge offered them an evidentiary hearing, directed the government to furnish them with a list of all the employees of the MCC who had had access to the meeting room, and gave the defendants' lawyers subpoena power to compel the presence of witnesses at the [evidentiary] hearing."). In several declarations submitted to the Court of Appeals for the District of Columbia Circuit, plaintiffs state that they never received this information. Pls.' Mot. to Comply Ex. E(A). In light of these declarations, the Court of Appeals expressed concern that this court may have improperly concluded that plaintiffs failed to vigorously pursue discovery. *Tuite,* 98 F.3d at 1418, 1419.[4]

While plaintiffs' declarations may be sufficient to support the assertion that the government failed to provide plaintiffs with the list of individuals with access to the nineteenth floor at the MCC as directed · by Judge Williams, the declarations also under-

score the inadequacy of plaintiffs' efforts at discovery. These declarations provide no explanation why, if plaintiffs were not furnished with the information as directed by Judge Williams, this matter was not pursued before either Judge Williams or the Court of Appeals for the Seventh Circuit. The declarations provide simply another example of plaintiffs' apathy towards discovery in this case and their hope to traverse the landscape of discovery with but a single step.

Having considered the full extent of plaintiffs' efforts at discovery, including the possibility that additional discovery would be futile, the court remains convinced that plaintiffs have failed to show that the information sought is not available from alternate sources. Plaintiffs could have deposed or served interrogatories on numerous individuals employed by MCC or served MCC itself with discovery requests in hopes of obtaining relevant information. However, as AUSA Wawzenski's declaration makes clear, no such discovery has been conducted or even attempted by plaintiffs. Wawzenski Dec. ¶¶ 4, 5. Without having undertaken even the most minimal steps in the discovery phase of this case, it would be a mere conclusory assumption for plaintiffs to assert that additional discovery would be futile.

### 10. *The importance of the information sought to plaintiffs' case*

The final *Frankenhauser* factor to be considered is the importance of the information sought to plaintiffs' case. Courts have described this factor as the most crucial and important factor suggested by the court in *Frankenhauser. See Burke,* 115 F.R.D. at 229 ("The key consideration is the importance of the information to the plaintiffs' case.") (quotations omitted); *Urseth v. City of Dayton,* 110 F.R.D. 245, 253 (S.D.Ohio 1986) ("[O]ther courts [have] held that the most important of the *Frankenhauser* factors is the tenth factor, that being the importance of the information to plaintiffs' case."); *Crawford,* 469 F.Supp. at 263 ("The weightiest of these factors would appear to be the

---

4. Specifically, the Court of Appeals stated that "[i]f the District Court relied on these apparently mistaken assertions, then its judgment was in-

fected by a misunderstanding of appellants' particular need for the documents." *Tuite,* 98 F.3d at 1418.

one Judge Becker reserves from last: the importance of the information to the plaintiffs' case."). *But see Everitt*, 750 F.Supp. at 1067 ("[C]ourts are rarely, if ever, in the best position to evaluate one of the most critical considerations suggested by *Frankenhauser*—the importance of the information sought to plaintiffs' case.").

Plaintiffs assert that the information they seek is undeniably of great importance to plaintiffs' trial preparation and contend that the documents at issue are documents that are central to the allegations in plaintiffs' complaint. Plaintiffs go so far as to say that "[their] success in their Illinois action may rest on the production of these relevant documents." Reply to Opp. to Pls.' Mot. to Comply at 19.

In contrast, OPR concludes that the undisclosed information in their files is of little consequence to plaintiffs' case. OPR bases this conclusion on the fact that the report is inconclusive with respect to who is responsible for the alleged taping. Shaheen Dec. ¶ 7. Moreover, the report contains no evidence that any federal officer or employee had any role in tape recording conversations between the defendants and their counsel in the MCC. *Id.* OPR definitively states that "[o]ther than the report of Mr. Legal's interview, the OPR report contains no information that would assist the plaintiffs in proving their claims or that would appear likely to lead to such information." *Id.*

The position of OPR regarding the nature of the report does not stand alone. In considering and rejecting the *Infelise* defendants' post-trial motion to dismiss that case, Judge Williams concludes her opinion with the following:

> Finally, the court has reviewed the FBI's report on the alleged taping at the MCC, and the FBI's findings are inconclusive. The report indicates that the FBI does not have any leads, or evidence regarding who was responsible for the alleged taping. As was noted above, the FBI's findings to date are inconclusive, and the report does not contain any evidence that is favorable to the defense or the prosecution.

*United States v. Infelise*, 1992 WL 265862, *3 (N.D.Ill. Sept. 29, 1992). On appeal, the Court of Appeals for the Seventh Circuit buttressed the conclusions reached by Judge Williams:

> The FBI interviewed almost 150 people, including the defendants, their lawyers, the prosecutors, and employees of the jail. The report of the investigation, which was submitted in camera to the district judge (and which we have read as well), indicated that the investigation had been totally inconclusive.

*DiDomenico*, 78 F.3d at 298–99. Notwithstanding this court's suggestion in the previous Memorandum Opinion and Order that the material in the report may be relevant to plaintiffs' case and assist them in preparing for trial, the overwhelming evidence demonstrates that the information contained in the report would be of little consequence to plaintiffs' lawsuit and would not assist them in pursuing additional discovery or establishing liability against the defendants.

### C. *Weighing the Frankenhauser Factors*

After careful consideration of all the *Frankenhauser* factors, the court concludes that disclosure of the OPR report to plaintiffs is inappropriate. *See Tuite*, 98 F.3d at 1418 (cautioning against exclusive reliance on one particular *Frankenhauser* factor). An assessment of the relevant factors clearly shows that although the law enforcement privilege is qualified, it is a privilege that plaintiffs are incapable of overcoming in this case. Factors 1, 2, 4, 6, 9, and 10 each heavily weigh against disclosure. Any factors weighing in favor of disclosure are of insufficient strength to affect the court's conclusion on this issue. Plaintiffs have failed to demonstrate that the information is unavailable from other sources or that the information is of sufficient importance to their case to overcome the law enforcement privilege in light of the other *Frankenhauser* factors. Moreover, the sensitive nature of the report, the circumstances under which it was created, and its contents all support the conclusion that disclosure or even a more limited redacted production is unwarranted.

While plaintiffs' desire to uncover the information directly from the OPR report itself is understandable and perhaps the most efficient means to obtain this information, evidentiary privileges are not designed to further litigation efficiency. Instead, privileges generally cause both delay and consume judicial resources in resolving claims of privilege that arise both at trial and during discovery, aspects of litigation which most rules of evidence seek to minimize. By protecting relationships and values outside the courtroom, privileges demonstrate that even though the search for truth is of critical importance in the litigation process, it is not necessarily paramount to all other interests of society.

### III. *Conclusion*

For the reasons stated herein, including a balancing of the *Frankenhauser* factors and the additional considerations cited by the Court of Appeals, plaintiffs' Motion, on Remand, to Comply with Subpoena Dated July 20, 1994 is DENIED. This matter again stands DISMISSED.

SO ORDERED.